(No. 20248.—

EARL BOWMAN, Admr., Defendant in Error, *vs.* THE WOODWAY STORES, Inc., Plaintiff in Error.

*Opinion filed June 18, 1931—Rehearing denied October 7, 1931.*

Duncan, J., dissenting.

E. M. Spiller, and W. H. Hart, for plaintiff in error.

D. L. Duty, Ray D. Henson, and George T. Carter, for defendant in error.

Mr. Justice DeYoung delivered the opinion of the court:

Earl Bowman, administrator of the estate of Howard Eugene Bowman, deceased, instituted suit against the Woodway Stores, Inc., in the circuit court of Williamson county, to recover damages for the death of the plaintiff's intestate, and recovered a judgment for $6772 and costs. The defendant prosecuted an appeal to the Appellate Court for the Fourth District and that court affirmed the judgment. The record is here upon a writ of *certiorari* awarded upon the petition of the defendant.

The plaintiff in error, Woodway Stores, Inc., is a corporation and conducts a retail grocery store at Johnston City, in Williamson county. Earl Bowman with his wife and infant son, Howard Eugene, nineteen months of age, resided at White Ash, near Johnston City. On June 18, 1927, Bowman bought at the store of the plaintiff in error one dozen six-ounce sealed tin cans of "Pet" brand evapo-

rated milk and at another store a package of cereal known as "Grape Nuts." Two cans of the milk were opened and consumed on the three days succeeding the purchase. On June 22, the fourth day, a third can was opened by punching two holes in the upper part of the can. Some of the milk was poured into a glass or pitcher and water from a cistern on the premises was added. The cereal was served in separate dishes from a larger dish on the table, and the members of the family partook of the cereal with the milk so diluted. Bowman and his wife also drank coffee and ate eggs and biscuits. About two and a half hours later their infant son became ill at the stomach. Shortly thereafter the father and mother in succession were similarly stricken. Neighbors and a relative gathered at the house upon learning of the family's condition. Dr. L. H. Green, engaged in the general practice of medicine and surgery in the vicinity, was called and he arrived at the house about four and a half hours after the meal had been served. He examined the child, found that its pulse was rapid and that it suffered from cold perspiration, purging, vomiting and prostration. The parents exhibited the same symptoms. The child also had spasms, its illness was more severe than that of its parents, and it died on the next day.

Dr. Green examined the food from which the meal had been taken but no chemical or bacteriological analysis was made by him. The unused portion of the milk taken from the can on June 22 and the package of grape nuts which had been opened on the day of its purchase, were burned by his direction. He also examined the milk can, the top of which had been further opened, and discovered a small dark spot on the inside, but the rest of the interior was untarnished. Bowman saw the spot in the can on the next day. The evaporated milk consumed by Bowman and his family during the four days, including the day on which they were taken ill, had no peculiar taste or odor and was not contaminated. Dr. Green expressed the opinion that

the illness and death of the child were caused by ptomaine poisoning which resulted from the evaporated milk it had consumed.

Evidence was introduced showing the physical and sanitary conditions in and about Bowman's premises. The house is situated near an unimproved public highway. In close proximity to the house is a cistern the sides of which are of brick and cement, the bottom of cement and the top of pine boards. About thirty or forty feet from the cistern is an outside toilet. Water collected from the roof of the house during each rainfall supplies the cistern. A dog, a cat and about eighteen chickens are kept on the premises. The dishes are washed in hot water after each meal, but the can opener had not been sterilized before it was used to open the can of evaporated milk on June 22. The water consumed for domestic purposes is drawn from the cistern and the milk in question was diluted with it.

Testimony was admitted describing the process of making and canning evaporated milk. The milk is cooked for eighteen minutes at a temperature above 240 degrees Fahrenheit before it is sealed in cans. The cans are then stamped with the date on which they were sealed. It was shown that the milk sold Bowman complied with these requirements and that it was sealed on April 20, 1927.

An investigator for the Pet Milk Company obtained from Bowman and his wife the can which had been opened on June 22, 1927, another can from which about one-half of the milk had been removed and two filled cans which had not been opened. In September, 1927, the three cans containing milk were delivered to Dr. Joseph C. Willett, an analytical expert of the city of St. Louis and chief bacteriologist in the health division of that city, for examination. Dr. Willett found the contents of the partially filled can to be putrid. Upon a bacteriological examination he discovered that the organisms in the milk belonged to a group responsible for protein decomposition, but not to any

group causing disease. There were no ptomaines in the milk, no evidence of bulging of the can, and tests made on animals revealed no abnormal results. Dr. Willett opened the two sealed cans and by bacteriological and biological poison tests found that there were no living bacteria in the milk; that it was sterile and that it was not poisonous to human beings or animals. The doctor testified that there is more protein in evaporated milk than in the same quantity of a cow's natural milk; that if there were ptomaines in milk it would have an odor, and that symptoms formerly attributed to ptomaines were now understood to be owing to bacterial infection of food setting up infection in the alimentary tract instead of the poison having been formed before the food was consumed. It was the doctor's opinion that if there had been any bacteria or poison in the can of milk when it was sealed on April 20, 1927, the spoiled condition of the milk would have manifested itself on June 22, 1927, by the bulging of the can and when it was opened by the odor and taste of the milk, and that if the can then had defects sufficient to admit bacteria there would have been a discharge through the defects which would have been perceptible.

Dr. J. B. Moore, qualified by education and experience in chemistry and bacteriology, testified that ptomaines do not enter into the causation of disease to the extent that was formerly believed; that most of the cases called ptomaine poisoning a few years ago were acute gastro-intestinal infections resulting from the ingestion of infected food; that ptomaines do not appear in the decomposition of proteins until a high state of putrefaction is reached; that a number of different organisms might have caused the spasms and other disturbances experienced by Bowman's child, and that among the sources from which such bacteria may come are water, places contaminated by human beings, the excretions of animals and materials from open outhouses. Dr. Moore further testified that no sufficient study

had been made of the cause of the child's illness; that to determine the cause a knowledge of what the child had eaten for seventy-two hours before it became ill would be valuable and a chemical and bacteriological examination of the vomitus and bowel excreta would be essential. He expressed the opinion that partaking of the evaporated milk was not the cause of the child's illness and he attached no importance to the dark spot on the inside of the can from which the milk was taken on June 22. The spot, he asserted, would not cause the formation of a poison unless there were a hole in the can allowing the influx of air.

The testimony of Dr. Moore concerning ptomaine poisoning was supported by Dr. R. J. Hyslop of Herrin. To a question embodying the leading facts in evidence respecting the sanitary conditions in and about Bowman's premises, the food the child ate, the symptoms of its illness and the examination made without chemical or bacteriological tests, Dr. Hyslop answered that there would be no way of determining the cause of the child's illness. He further testified that, to determine the cause, it would be necessary, among other things, to ascertain what had entered the alimentary canal for at least seventy-two hours before the child became ill; that the subjection of milk to a cooking process at a temperature of 240 degrees Fahrenheit for eighteen consecutive minutes will sterilize milk and permit no living organism to remain in it; that there could be no formation of ptomaine in milk so sterilized while the can remained unopened; that such milk sealed could only become poisonous through contamination after the can had been opened and that if there were no bad taste or odor at the time the can in question was opened, it would indicate that its contents had not been contaminated. Dr. Hyslop testified that tin or solder in food will not affect the human system; that water is often contaminated, and he expressed the opinion, upon the facts stated, that infected food which caused acute gastro-intestinal infection, and

not the evaporated milk consumed, was responsible for the child's condition.

The action in this case is based upon the alleged breach of an implied warranty on the part of the plaintiff in error that the evaporated milk, at the time of its sale to Earl Bowman, was free from poisonous matter and was fit for human consumption. The plaintiff in error, among other contentions, insists that the declaration fails to state a cause of action. Assuming for the present purpose that a cause of action is stated in the declaration, there can be no dispute that, to establish liability on the part of the plaintiff in error the evidence must show that the milk, at the time the can was opened, was unfit for human consumption and caused the child's illness and death.

The milk was not used in the condition in which it was sold, but was diluted with water drawn from an open cistern. There was no examination of the milk as taken from its container. It had no offensive odor or taste, and there was no statement by any witness that at the time the can was opened the milk was putrid or poisonous. While there was evidence of the susceptibility of milk to putrefaction there was none that the milk in question was in that condition, either when taken from the can on the fourth day following its purchase or later that same day when it was examined by Dr. Green, the attending physician.

The evidence is undisputed that while cans containing sterilized evaporated milk remain intact, ptomaines cannot form in the milk. There was no evidence that the can opened on June 22 was defective or that the spot on the inside affected its contents. The failure of the attending physician to state any fact tending to show an unwholesome condition of the milk left no basis for his opinion that ptomaine poisoning was the cause of the child's illness and death. His opinion was therefore wholly conjectural.

The evidence shows that there are numerous ways in which milk and other food may become contaminated after

exposure and bacterial infection result therefrom. The can of milk in question had been open for more than four hours before it was examined by the attending physician. If, after it was diluted, there was contamination of the mixture, an independent efficient cause existed which could produce infection, but had no pertinency to the condition of the milk when it was sold. (*Illinois Central Railroad Co.* v. *Oswald,* 338 Ill. 270.) The burden was upon the defendant in error to establish by competent evidence the poisonous or unwholesome condition of the milk when the can was opened. Evidence of later contamination would not be responsive to the allegations of the declaration and would create no liability against the plaintiff in error.

When the Appellate Court has affirmed a judgment for the plaintiff in an action at law this court is precluded from weighing the evidence to determine where the preponderance lies. Where, however, there is a motion to direct a verdict for the defendant, as there was in this case, the evidence may be examined for the purpose of determining whether, when all the evidence is considered in its aspect most favorable to the plaintiff, there is a failure to prove an element essential to the maintenance of the cause of action alleged. (*Illinois Central Railroad Co.* v. *Oswald, supra*). The unwholesome condition of the milk when sold was an essential element to be proved, and the evidence failed in that respect. The court should have instructed the jury to find the plaintiff in error not guilty.

The judgments of the Appellate and circuit courts are reversed and the cause is remanded to the circuit court.

*Reversed and remanded.*

Mr. JUSTICE DUNCAN, dissenting.