Robert Harris, Appellee, v. Coca-Cola Bottling Company of Chicago, Inc., a Corporation, Appellant.

Gen. No. 48,506.

First District, Third Division.

May 23, 1962.

Hinshaw, Culbertson, Moelmann & Hoban, of Chicago (Oswell G. Treadway, of counsel), for appellant.

Stephen M. Herman, of Chicago, for appellee.

MR. PRESIDING JUSTICE McCORMICK delivered the opinion of the court.

Robert Harris brought an action in the Municipal Court of Chicago against the Coca-Cola Bottling Company of Chicago, Inc. (hereafter referred to as the de-

fendant). The action was brought to recover for damages alleged to have been sustained by the plaintiff as the result of drinking from a bottle of Coca-Cola in which there was a small dead rat or mouse. The suit was predicated on an alleged breach of an implied warranty that the beverage was free from defects and impurities and fit for human consumption. The jury returned a verdict in favor of plaintiff and against defendant, assessing plaintiff's damages at $900. The judgment appealed from was entered on that verdict. Thereafter the defendant's post-trial motion was overruled.

The defendant here contends that the evidence adduced by plaintiff was not sufficient to prove a breach of warranty on the part of the defendant, that the defendant was irreparably prejudiced by the admission of improper evidence and by the rulings made by the trial court, and that the court erred in the giving and refusing of certain instructions.

Plaintiff on July 26, 1956, and since 1951, had been employed as a bus boy by the Black Orchid Supper Club in Chicago, Illinois. He started work at three o'clock in the afternoon and worked until about closing time. On the day in question at about six o'clock he went to the kitchen of the Black Orchid Supper Club and the cook gave him his dinner. He did not remember what he had but he thought it was stew. He also got a capped bottle of Coca-Cola to drink with it, which he opened at the bottle opener at the fountain. He ate some of his dinner and took a swallow of the coke. He found there was something wrong with it and he then discovered parts of the mouse in the bottle. He stated some of the hair off the mouse was in his mouth and he felt "grease or something" in his mouth. As a result he started vomiting. He took the bottle and left the kitchen, and the head waiter sent him in a taxicab to Wesley Memorial Hospital.

In the hospital he was sent to the emergency room where a physician took his history and gave him a physical examination, the findings of which were essentially negative. He was given a half grain of phenobarbital to alleviate anxiety. The bottle of Coca-Cola, which had a terrible odor and which had in it a dark, heavy object with a skeleton resembling a mouse, was placed in a refrigerator to be sent to bacteriology for culture and sensitivity. After leaving the hospital the plaintiff went home and went to bed. His mother called the family doctor because the plaintiff was "vomiting and running to the washroom." The physician testified that the plaintiff was in a panicky state and nauseated, that he gave him a hypodermic containing a sedative and an antibiotic, and also gave him an enema. He told him to apply hot packs to his body, drink plenty of fluid and not to eat any food for a day or two. He stated that the plaintiff had a fear that he had suffered permanent injury from the occurrence. The physician visited plaintiff several times at his home, where the plaintiff continued vomiting for some four days. The plaintiff continued to receive treatment at the doctor's office for several weeks and the doctor submitted to the plaintiff a bill in the amount of $112.

 The defendant first argues that there is no evidence in the record tending to prove that the bottle of Coca-Cola from which the plaintiff allegedly drank was bottled or sold to the Black Orchid Supper Club by the defendant.

It is true that the only evidence in the record is that the defendant had an exclusive franchise to bottle and distribute Coca-Cola in the Chicago area. However, that question is not before this court for consideration because it was not raised by the defendant in its post-trial motion, and unless it was so raised and passed on by the trial court it cannot be considered here. Perez

v. Baltimore and Ohio R. Co., 24 Ill App2d 204, 164 NE2d 209.

In the post-trial motion the defendant says: "There was no competent evidence introduced by the plaintiff, or in any evidence offered or received by the Court, to show that the Coca-Cola in question was in the same condition at the time it was allegedly placed in the hands of the plaintiff *as said Coca-Cola had been at the time it left the control of the defendant.*" Defendant further states: "There was no competent evidence adduced on the trial of the cause to show either that the Coca-Cola bottle in question had not been tampered with or, in the alternative, that there was no reasonable opportunity for tampering *with said bottle after it had left the control of the defendant.*" (Italics ours.) From these statements the implication is uncontrovertible that at the time of the argument of the post-trial motion there was no contention on the part of the defendant that the bottle of Coca-Cola had not been bottled and sold by it to the Black Orchid Supper Club.

■ The defendant next argues that the burden rests upon the plaintiff to prove, by direct or circumstantial evidence, either that there was no reasonable opportunity for tampering with the bottle or, if the evidence discloses that there was reasonable opportunity for tampering, that there actually was no tampering or adulteration.

The record shows that the plaintiff testified that on the day in question when he got his supper from the cook he went into the dining room and asked the bartender for a bottle of Coca-Cola, which the bartender gave to him. The bottle of Coca-Cola was obtained from a refrigerator back of the bar, which was kept locked when the bartender was not there. He also testified that Coca-Cola was kept in the kitchen behind the bar where the bartender was, but that those Coca-Colas were not kept cold, and that when the defend-

ant's employees delivered the Coca-Cola it was left upstairs and checked off, and nobody got in or used any of them.

The plaintiff had testified that one Dickson saw him get the Coca-Cola. Dickson testified that plaintiff got his Coca-Cola out of a case, and, after considerable prodding on cross-examination, that plaintiff got his Coca-Cola out of a case in the kitchen. The plaintiff also testified that he noticed at the time when he removed the cap from the bottle that it was just an ordinary cap and it came open like any other bottle which he had opened previously, and that the cap was no looser than that on the other bottles which he had opened in the past.

The defendant relies on the case of Williams v. Paducah Coca Cola Bottling Co., Inc., 343 Ill App 1, 98 NE2d 164. In that case the plaintiff alleged that he had been made ill by drinking from a bottle of Coca-Cola in which there was a penny-match-box cover. The evidence further showed that the plaintiff bought the Coca-Cola from a particular store; that at that store beverages from some seven different companies were delivered and placed on the floor at the front of the store at a point where it was accessible to the general public and to all the different competitors of the defendant; that the beverages were cooled in an ice container that was near the front door of the store and was accessible to anyone who desired to raise the lids and reach into the container; that customers frequently served themselves; and that the store was used by some as a lounging or loafing place. The jury returned a verdict for the plaintiff and the court entered judgment thereon. In its opinion the court discusses Patargias v. Coca-Cola Bottling Co. of Chicago, Inc., 332 Ill App 117, 74 NE2d 162, and points out that in the Patargias case no issue was presented as to whether or not the defendant had bottled the particular bottle

in question or as to the opportunities for tampering with the bottle after it had left the control of the manufacturer or bottler, and that those issues in that case were treated as having been proven in plaintiff's favor. The court cites Coca-Cola Bottling Works v. Sullivan, 178 Tenn 405, 158 SW2d 721, where the court distinguishes between implied warranties of fitness of food contained in sealed cans and liquids in a capped bottle, and, quoting from that case, the court says:

> " 'But, there is a fourth class of cases, in which the instant case falls, which presents the difficulty with which we here have to deal; the cases of soft drink, or milk bottles, or the like, enclosed by caps which it is possible to remove and replace, by the use of care. We have here a distinctive element of fact which breaks the conclusive continuity of control between the bottler and the consumer, when the physical possession has been in a third party, such as an intermediary vendor. To close this gap of control so as to make fairly applicable the rule of presumptive or prima facie negligence on the part of the bottler or manufacturer, we are of opinion that a higher degree of proof must be made that there has been no reasonable opportunity for tampering with the bottle, or its contents, in the interim between the physical control of the bottler or manufacturer, and that of the consumer.' "

The court further says:

> "Bottled cokes and many other drinks are sealed with a crown cap. It is possible, with care, to remove and reseal the container without the removal being easily detected. This is a very different situation from that presented by products which are sealed in cans or with a seal of paper or some other substance added to the crown or other closing de-

vice. When a person who buys food in sealed cans obtains possession of the can it is generally possible for him to tell by the slightest inspection whether or not it has been tampered with since the can was sealed. There is a fair inference if the tampering is not obvious that the contents are in the same condition on opening that they were in when sealed. This is not true with a bottle sealed with a crown cap and such inference cannot be made."

The court holds that where the consumer of the food is attempting to fix a liability upon a remote seller he must assume the burden of proving that the condition of the food at the time when it left the control of that remote seller was the same as immediately prior to its consumption, which burden may be fulfilled by proof that there was no reasonable opportunity for tampering with the bottle or, if there was such reasonable opportunity, by proof that there was actually no tampering or adulteration. The court held that the plaintiff had not in that case sustained the burden of proof.

In Sharpe v. Danville Coca-Cola Bottling Co., 9 Ill App2d 175, 132 NE2d 442, the evidence was that the bottle of Coca-Cola was taken by the plaintiff from a vending machine at a motel; that prior to being placed in a machine the bottle was kept with others in a building behind the motel and that the operator of the motel did not know whether this building was always locked; that before it was brought to the motel it came from a tavern where it was stored with other soft drinks in a back room; that there was a door leading from the tavern proper into the storage room; that this storage room was open to the public; that 60% of the public used the back door entrance to the tavern and walked through the storage room in entering the tavern; and that the men's and women's restrooms opened onto the

area where the Coca-Cola and other soft drinks were stored. The court follows the Williams case and holds that there was not sufficient evidence to prove lack of opportunity for tampering.

Heimsoth v. Falstaff Brewing Corp., 1 Ill App2d 28, 116 NE2d 193, was a suit brought where the plaintiff became ill after drinking a bottle of beer containing a "prophylactic latex." The bottle of beer in question was delivered to a distributing company in the town where the tavern from which the plaintiff bought the beer was located. The distributor picked up the beer in its own trucks which had closed van bodies with doors, and it was the practice when the beer was loaded to keep the doors locked. The beer was then placed in the distributor's warehouse and kept under lock and key when no one is there, and was under the supervision of the distributor's employees at other times. It was then delivered to the tavern and taken downstairs by the owner and kept until it was brought up from the basement by him and put in a cooler-box underneath the bar. There was testimony that when the bartender uncapped the bottle of beer it foamed and was a "live bottle." In that case the trial court directed a verdict on the ground that the plaintiff had failed to prove his case in the light of the Williams case. The judgment entered in the trial court was reversed. The court discusses Williams v. Paducah Coca Cola Company, supra, Sullivan v. Coca Cola Bottling Co. of Chicago, 313 Ill App 517, 40 NE2d 579, Duval v. Coca-Cola Bottling Co., 329 Ill App 290, 68 NE2d 479, and Patargias v. Coca-Cola Bottling Co. of Chicago, supra, and the court says:

"When the product of the manufacturer involves a sealed or capped bottle of the type under consideration before us, and particularly, where the evidence shows circumstances inconsistent with tam-

416

pering, such as the foaming of the beer upon the bottle being opened, the direction of a verdict on the ground that where there was a possibility of tampering through some activity which would not normally or reasonably be anticipated or probable on the basis of the evidence presented, is not justified. It would raise an unreasonable and impossible standard of proof which would require that a claimant who seeks to recover as against a manufacturer must trace the particular bottled and sealed item, minute by minute, from the time of its delivery by the manufacturer until actual consumption by the consumer, before a plaintiff would have the right to a jury determination of whether or not there had been tampering or possible tampering, as a question of fact. Under the facts and circumstances in the case we believe that the trial court erred in allowing the motion for a directed verdict."

In Beyer v. Coca-Cola Bottling Co., 75 SW2d 642 (Mo), the court deals with the case of alleged illness caused by a mouse in a bottle of Coca-Cola, and the court points out that the fact of the swollen and decayed condition of the mouse would indicate that the mouse must have got into the bottle a considerable time before the bottle had been opened.

In Crystal Coca-Cola Bottling Co. v. Cathey, 83 Ariz 163, 317 P2d 1094, the case concerned a fly in a bottle of Coca-Cola. In that case the evidence concerning the possibility of tampering was less than the evidence in the case before us. The court cites and quotes from Coca-Cola Bottling Works v. Sullivan, supra, and says:

". . . the plaintiff must either prove 'that there has been no reasonable opportunity for tampering' or that there was no tampering 'with the bottle, or

417

its contents, in the interim between the physical control of the bottler or manufacturer, and that of the consumer.' This is a question of fact which the plaintiff may prove by circumstantial evidence for submission to the jury under proper instructions. In the instant case the court instructed the jury that in order for the res ipsa loquitur doctrine to apply, they must determine that the fly did not get into the bottle as a result of the intervening act of a third party and that the condition of the bottle was the same when it left the defendant bottling company's control as when it was received by the plaintiff. We believe the jury might reasonably have decided that under the circumstances there was no tampering with the bottle after it left the bottler's control. To decide that there was a tampering would require the jury to believe in this case that a person would go unobserved to the cooler behind the counter in a drugstore or the druggist or one of his employees would go to the cooler and place therein a bottle of coca-cola in which he had put a fly by removing and replacing the cap and this without being able to foretell who might be served that bottle or when it might be served. This, we submit, is too far-fetched for reasonable men to consider seriously."

In Duval v. Coca-Cola Bottling Co., supra, another case of a mouse in a bottle of Coca-Cola, the plaintiff had obtained the bottle from a vending machine at a municipal airport. There was evidence in the record that the defendant delivered the Coca-Cola to one of its salesmen in the vicinity of the airport, who kept it in his garage, and that the bottles were sealed when they were delivered to him, and from that testimony the court infers that the man to whom the defendant delivered the Coca-Cola serviced the vending machine. The court says:

418

"The bottles were sealed when they were delivered to this salesman and the bottle which was presented to plaintiff by the machine on the night in question was sealed and was, presumably, one which had been placed in the machine by the salesman. We believe that defendant, for practical purposes, had exclusive control of the bottle of Coca-Cola. Fisher v. Washington Coca-Cola Bottling Works, 84 Fed Rep 261. We cannot take seriously any suggestion that the mouse may have entered or been placed in the bottle while in the garage of the salesman."

In the instant case the evidence is sufficient to raise a question for the jury's determination as to whether or not the bottle of Coca-Cola had been tampered with after it left the control of the defendant, and the jury's verdict is not against the manifest weight of the evidence.

■ In the instant case the defendant has introduced evidence of an expert to the effect that because of the chemical composition of Coca-Cola the development of bacteria is minimized and that drinking Coca-Cola from a bottle containing a mouse would not cause injury or illness. The issue in the case which the jury had to determine was whether or not the ingestion of a beverage in which a mouse had been interred would cause a person to suffer physical disturbance for which he ought to be allowed damages. The question of whether or not the plaintiff was poisoned by bacteria is not the question before the jury. In spite of the fact that the expert's testimony is to the effect that the bacteria formed by the decomposing mouse would not produce a serious type of food poisoning, nevertheless the jury had a right to determine whether the consumption of Coca-Cola in which a badly battered mouse had been steeped would produce in the ordinary person a definite physical, as well as a mental, reaction.

■ The defendant also contends it did not have a fair trial because the plaintiff had in his evidence testified to a heart condition he proposed to show was aggravated by the drinking of the Coca-Cola. The plaintiff produced an expert witness and propounded a hypothetical question concerning the possible aggravation of the heart condition of the plaintiff by the consumption of the Coca-Cola in question. The court sustained defendant's objection to the question and the court thereupon instructed the jury that they should eradicate from their minds all testimony given by the plaintiff in connection with or showing any relation between the drinking of the Coca-Cola and the alleged aggravation of his heart condition. To us it is apparent that when the jury returned a verdict of $900 that they did not consider that an aggravated or permanent injury had been inflicted on the plaintiff.

■ ■ The defendant also argues that the discussion of the plaintiff's heart condition was prejudicial to the defendant and that the court did not adequately instruct the jury to disregard all references to that condition. In his argument to the jury the plaintiff's attorney mentioned that the plaintiff had testified he had a weak heart since early childhood. The court on the objection of the defendant again informed the jury that they were to disregard reference to the matter of the plaintiff's alleged condition of his heart. The plaintiff's attorney thereupon stated to the jury that whatever the conditions or medical problems were which had come to the plaintiff because of the instant occurrence the jury should apply their knowledge of life and how the human body is affected by "shock and things like that." The defendant objected to that argument and the court overruled the objection. We do not think that the defendant was prejudiced by this argument, which is the ordinary argument made in almost every personal injury case. As we have said, the fact that

the jury returned a verdict of $900 would indicate to us that they considered that sum a proper compensation for the shock and physical revulsion occasioned by the plaintiff drinking from the bottle of Coca-Cola containing a dead mouse and finding in his mouth some of the slime and hair from the mouse. We cannot say that the amount of the verdict would indicate that the jury acted unreasonably or were influenced in their finding by prejudice and sympathy.

■ The defendant also objects to certain instructions given by the court. The court gave the jury the following instruction:

> "You are instructed that the defendant, Coca-Cola Bottling Company of Chicago, Inc., a corporation, impliedly warrants that the product at the time it leaves the control of the defendant is pure, free from impurities and fit for human consumption and that this warranty persists until consumed in whole or in part by the plaintiff, and if you find that a partially decomposed mouse, if any, was contained in the bottle and you further find that the Coca-Cola was not thus fit for human consumption, and if you further believe from the evidence that there was no tampering with the bottle after it left the control of the defendant, then the defendant has breached its warranty."

The defendant objects to this instruction primarily because there was no proof in the record showing that the Coca-Cola bottle from which the plaintiff drank was the product of the defendant. However, it appears that the case was tried upon the theory that the bottle of Coca-Cola was the product of the defendant. At the request of the defendant the court had instructed the jury as follows:

> "The plaintiff cannot recover in this case against the defendant, Coca-Cola Bottling Company of Chi-

cago, Inc., unless you believe that the plaintiff has proved by a preponderance of the evidence each of the following propositions:

"First—That the Coca-Cola in question contained at and before the purchase by the plaintiff a foreign substance which rendered said Coca-Cola unfit for human consumption.

"Second—*That said foreign substance was present in said Coca-Cola at the time it left the control of the defendant, Coca-Cola Bottling Company, of Chicago, Inc. . . .*" (Italics ours.)

The defendant in the instruction proffered by it impliedly told the jury that the bottle of Coca-Cola was the product of the defendant and had been sold by it to the Black Orchid Supper Club. Hence there is no merit in defendant's objection to the instruction.

■ The defendant also objects to the refusal of the court to give an instruction offered by the defendant telling the jury that they could not bring in a verdict in favor of the plaintiff "merely because you may sympathize with him." That instruction the court held was covered by other given instructions. The jury were instructed that they must look solely to the evidence and the instructions of the court and they must find their verdict without any reference to who the plaintiff is or to who the defendant is and "without any prejudice or favor whatsoever." The court committed no error in refusing to give the instruction.

■ ■ The defendant also objects to the court's refusal to give the following instruction:

"You are instructed that if you find from the evidence that the plaintiff, Robert Harris, did not receive any physical injury from contact with the contents of the bottle of Coca-Cola mentioned in the evidence, and if you find further that Robert Harris' only discomfort proximately resulted from

422

his thoughts or contemplation of the contents of the said bottle, or what the plaintiff, Robert Harris, had had in his mouth, then you will find the defendant not guilty."

There is no question that this instruction does not state the law. The defendant in its brief takes the view that the discomfort of the plaintiff arose merely from contemplation and anxiety and therefore he sustained no damages. As we have pointed out, the damages accrue from drinking the Coca-Cola, seeing a decomposed mouse in the bottle, and having in his mouth some of the hair of the mouse together with the effluvia therefrom. The requested instruction would tell the jury that even if plaintiff had been drinking from the bottle of Coca-Cola and had got some portion of the decayed deceased mouse in his mouth that fact would give rise to no action for damages. That is not and never had been the law. The suit here is not an attempt to base damages purely on terror or fright resulting in nervous shock. There was physical contact of such a character that it could in a person of ordinary sensibilities produce revulsion and physical illness.

 The defendant also objects to the refusal of the court to give an instruction that the jury must not compromise between law and damages, nor should they arrive at their verdict by chance, and that they should only return a verdict after due deliberation and fairly considering all the evidence and the law as given in the instructions. The cautions set out in that instruction were fully covered by other instructions given to the jury.

We find no error in the court's rulings on the instructions.

 The defendant also alleges that it was deprived of a fair trial because of the argument of plaintiff's counsel. Among other things it objects to a statement made by plaintiff's counsel that the defendant

had objected to the plaintiff bringing the manager of the Black Orchid Supper Club into the courtroom as a witness. While the defendant's counsel was arguing to the jury he made the statement that there was no evidence in the case as to when the bottle in question reached the Black Orchid Supper Club. Counsel for the plaintiff interrupted and said that the defendant's counsel had objected to plaintiff bringing the manager into the courtroom and that defendant would not let him put the manager on the stand. The court overruled the objection. The defendant here urges that even though the objection was overruled it was prejudicial to the defendant. Nothing appears in the abstract with reference to the proffer of the witness. The defendant at the time did not move for a mistrial and its counsel, after the court had overruled the objection, stated that the court has ruled on that and it is not a matter for the jury. We cannot see how the jury was prejudiced by this interchange between counsel, and in any case it is not reversible error.

 When the plaintiff was testifying his counsel asked him what he noticed, if anything, when he removed the cap from the bottle. The witness replied it was just an ordinary cap and that he had seen a lot of them where he worked. He further stated: "It was an ordinary cap which had been opened. I open them all the time, and I can tell there was nothing wrong with it." Counsel for the defendant made an objection which the court overruled. Counsel then said that the statement of the witness was a conclusion, and the court then stated that it did not require an expert to determine whether the cap had been opened previously. After a discussion in chambers the court struck from the record the answer given by the plaintiff: "I open them all the time. I can tell there was nothing wrong

424

with it." Also stricken was the remark of the court, and the jury were instructed to disregard the statements. We do not think that the remark of the court, after he had instructed the jury to disregard it, would constitute reversible error.

The judgment of the Municipal Court of Chicago is affirmed.

Affirmed.

DEMPSEY and SCHWARTZ, JJ., concur.