**Helga Neubauer, Plaintiff-Appellee, v. Coca Cola Bottling Company of Chicago, Defendant-Appellant.**

Gen. No. 67–124.

Second District.

May 9, 1968.

Rehearing denied and supplemental opinion July 17, 1968.

Hinshaw, Culbertson, Moelmann & Hoban, of Chicago, for appellant.

Lidschin & Pucin, and Michael Nemeroff, of Waukegan, for appellee.

MR. JUSTICE DAVIS delivered the opinion of the court.

This is a products liability case brought by Helga Neubauer against the Coca Cola Bottling Company of Chicago for injuries allegedly sustained by reason of the consumption of part of a bottle of Coca Cola, herein called Coke, which contained a foreign substance. The plaintiff charged that the defendant was the bottler and distributor of the Coke in question. The jury returned a verdict for the plaintiff, from which the defendant appeals.

The defendant contends that the trial court erred in refusing to grant its motions for directed verdict or for judgment notwithstanding the verdict. The basis for such motions was that the plaintiff failed in her proof to establish that the defendant manufactured or sold the bottled Coke in question, or that any deleterious condition existed in the product when and if it left the supervision of the defendant, or that the bottle of Coke was not tampered with after it left the control of the defendant. In the alternative, the defendant contends that the judgment should be reversed and remanded for a new trial on the basis of evidentiary and other errors occurring at the trial.

The plaintiff testified that on Saturday, June 4, 1966, she and her husband, with the help of two other men, were moving into a new apartment. At about 11:00 a. m., she went to Tony's Liquor Store, which was nearby, where she selected six bottles of Coke and six bottles of Seven-Up from a cooler, and brought them back to the new apartment. She opened four of the Coke bottles, using the same procedure and attaining the same result which she had experienced in the past when opening other bottles of soft drinks. The plaintiff's Coke was cold and carbonated; she quickly drank about one-half of it and noticed nothing unusual about its taste.

One of the men, who was helping the plaintiff and her husband move, noticed something unusual in the

plaintiff's Coke. An examination revealed a dark film on the inside of the bottle, with particles floating in the Coke and sediment at the bottom.

The plaintiff was well until approximately 6:00 p. m., when her stomach started to hurt. Later she became nauseated and had diarrhea. She was sick on Sunday, went to work on Monday, but was not able to do much. On Tuesday, she again went to work but was forced to leave at noon, and went to the hospital where she remained until the following Tuesday, June 14, 1966.

The bottle in question was a ten-ounce bottle. An officer of Tony's Liquor Store testified that he bought his Coke from the defendant but had never purchased a ten-ounce bottle from it. An employee of the defendant testified that the defendant is the only company bottling and distributing Coke to dealers in Lake County—the area in which Tony's Liquor Store is located. Employees of the defendant also testified that no ten-ounce bottles were sold to Tony's Liquor Store.

■ It is the defendant's contention that the plaintiff's evidence failed to establish that the defendant manufactured or bottled the Coke in question. It may be conceded that this is the first essential element of the plaintiff's case. Welch v. Coca-Cola Bottlers' Ass'n (Tex), 380 SW2d 26, 30 (1964); Hart v. Coca-Cola Bottling Co., 119 Ohio App 90, 188 NE2d 817, 818 (1963); 36A CJS, Food, § 69(1), p 921.

The defendant relies, primarily, on the fact that the Coke in question was in a ten-ounce bottle; that the store owner and the defendant's employees testified that ten-ounce bottles of Coke were not sold to the store; that the defendant's witnesses stated that ten-ounce bottles are sold to business entities where there is on-the-premises consumption through coin operated coolers, and to certain other outlets for resale in case lots as leader items.

It is not denied, however, that the defendant is the only Coca Cola bottler and distributor in this area; that Tony's Liquor Store purchased Coke from the defendant; or that the plaintiff testified, unequivocally, that she purchased the Coke from Tony's Liquor Store. The proximity of the store to the apartment renders it somewhat logical that she would get the Coke there. There is no reason for the plaintiff to testify falsely concerning where she purchased the Coke, and it is not likely that she would forget where she purchased it.

■ We cannot say that the plaintiff's testimony, and the further evidence that the defendant was the exclusive distributor in the area, and that Tony's Liquor Store purchased its Coke from the defendant, is of insufficient probative value to show that the Coke in question was bottled by the defendant. The direct, positive evidence relative to the ten-ounce bottle was conflicting. From this evidence the jury might well have determined that a ten-ounce bottle was mistakenly delivered to Tony's Liquor Store by the defendant. Whatever else it may have determined on the basis of these facts, there was adequate evidence for a jury to decide that the Coke in question was bottled and sold by the defendant.

Unlike Welch v. Coca-Cola Bottlers' Ass'n, supra, cited by the defendant, there was no evidence in the case at bar that any other Coca Cola bottler sold or distributed Coke in the defendant's exclusive franchise area.

■ In order to hold the defendant—a remote seller—liable, the plaintiff need not prove negligence but must establish as in any other products liability case: (1) that her injury resulted from a condition of the product; (2) that the condition was an unusually dangerous one, and (3) that the condition existed at the time the product left the manufacturer's control. The plaintiff must also prove the exercise of due care for her own safety. People ex rel. General Motors Corp. v. Bua, 37 Ill2d 180, 196, 226

24

NE2d 6 (1967); Suvada v. White Motor Co., 32 Ill2d 612, 623, 210 NE2d 182 (1965).

█ The defendant strongly suggests that the third requisite listed above has not been met. In a food products case, such as this one, where the product is contained in a bottle with a crown cap, proof that an unusually dangerous condition existed at the time it left the defendant's control may be met in either one of two ways: by proof that there was no reasonable opportunity for tampering with the bottle; or, if there was such an opportunity, then by proof that there actually was no tampering. Harris v. Coca-Cola Bottling Co., 35 Ill App2d 406, 415, 183 NE2d 56 (1962); Sharpe v. Danville Coca-Cola Bottling Co., 9 Ill App2d 175, 178, 132 NE2d 442 (1956); Williams v. Paducah Coca Cola Bottling Co., 343 Ill App 1, 11, 98 NE2d 164 (1951).

█ It must be conceded that there was less than an abundance of proof on either of these issues. There was no evidence as to the manner of delivery to, or the storage of the Coke at Tony's Liquor Store. By the plaintiff's own testimony, the Coke was obtained from a cooler in the store which was accessible to the general public. It cannot be said that there was an absence of reasonable opportunity to tamper with the bottle. Williams v. Paducah Coca Cola Bottling Co., supra.

The question remains as to whether there was sufficient proof that in fact there had been no tampering. The plaintiff's proof on this issue consisted of her testimony that the bottle opened in a normal fashion; that it was carbonated, and it did not taste unusual. In Heimsoth v. Falstaff Brewing Corp., 1 Ill App2d 28, 116 NE2d 193 (1953), where the court held that it was error to direct a verdict for the defendant at the close of the plaintiff's case, the fact that the bottle of beer which contained a foreign substance foamed upon being opened, was considered as significant. At page 35, the court stated that the

foaming of the beer upon the bottle being opened, was a circumstance inconsistent with tampering. In Sharpe v. Danville Coca-Cola Bottling Co., supra, at page 180, the court stated that the plaintiff's testimony that the Coke tasted flat "is an important circumstance in that it supports the inference that the bottle cap had been loosened permitting air to enter and thus destroying carbonation."

While the burden of proof is on the plaintiff, this burden is to establish the essential elements of her case by a preponderance of the evidence. In a case where there is an opportunity to tamper with a bottle, proof that there was in fact no tampering, does not require that the plaintiff shoulder the impossible burden of tracing and accounting for a particular bottled product from the time it is sealed to the time it is consumed. Of necessity, the plaintiff's proof must, in the great majority of such cases, be circumstantial. Evidence that the cap opened in the normal fashion; that the Coke tasted normal and not flat, and that it was carbonated, was sufficient for a jury determination of whether or not the Coke had, in fact, been tampered with.

While the plaintiff did not offer an extensive quantity of evidence on the several elements essential to sustain her case, the defendant's contention that the trial court erred in refusing to direct a verdict or to grant it a judgment notwithstanding the verdict, does not call upon us to substitute our judgment for that of the jury. It only calls upon us to determine whether all of the evidence, when viewed in its aspect most favorable to the plaintiff, so overwhelmingly favored the defendant that no contrary verdict based thereon could ever stand. We cannot say that such is the case. Pedrick v. Peoria & Eastern R. Co., 37 Ill2d 494, 510, 229 NE2d 504 (1967).

Dr. George B. Callahan, the plaintiff's attending physician, testified on her behalf. He first saw her at the hospital on June 7, 1966, where he took a history of her

condition, which coincided with her testimony at the trial. He diagnosed her condition as acute gastrointernal colitis, made the necessary tests and successfully treated her. In response to a hypothetical question, he stated that in his opinion, based on a reasonable degree of medical certainty, the drinking of a portion of Coke in question was the causative agent of the plaintiff's ill-being.

The plaintiff called a biochemist as a witness. He had examined the Coke in question during the latter part of April, 1967—almost one year after the incident. The defendant contends that it was error to permit this witness to testify as to the findings of his tests and examination.

The plaintiff testified that she recapped the bottle with a rubber stopper about an hour after she drank from it. The bottle remained capped, and, for the most part, refrigerated until it was turned over to the biochemist for examination. The plaintiff testified that, except for that portion of the Coke removed by him, the physical appearance of the remaining contents of the bottle was the same at the time of the trial as it was on the day when she drank part of it.

The biochemist testified that his examination of the Coke disclosed a dead mold known as rhizopus—a slimy mold; and that the growth of the mold was dense and was of the type customarily found in liquid. He further stated that at the time of the examination the rhizopus was not viable; and that he could not state when the mold was alive. He also testified that there is a wide variety of this type of mold and that some varieties are dangerous and "will produce untoward effects" when consumed in food or drink, and others will not. He could not state from his tests whether this particular mold would make a person ill.

The trial court refused to strike the testimony of this witness, and stated that the defendant's objections were

to the weight to be accorded the testimony rather than to its admissibility. The court expressed doubt as to whether the testimony helped the plaintiff's case.

■■■ As to the length of time which elapsed between the date of the incident and the date of the examination, the cases cited by the defendant, relating to experiments conducted after an incident, in which it is sought to simulate conditions and to show by experiment that a given thing either could, or could not, have happened, are distinguishable. In such cases it must appear that the essential conditions of the experiment are the same as those existing at the time of the incident in order for the experiment to be admissible. Hammer v. Slive, 35 Ill App2d 447, 454, 455, 183 NE2d 49 (1962). Such cases, however, are not particularly helpful in determining whether the results of tests on allegedly contaminated foods may have relevancy in a case.

In Tiffin v. Great A. & P. Tea Co., 18 Ill2d 48, 162 NE 2d 406 (1959), which affirmed 20 Ill App2d 421, 156 NE2d 249 (1959), the court had before it the question of contamination of a ham. On June 13, 1953, certain members of a family ate the ham in question. Shortly thereafter, they all became ill and one of them died. On June 17, certain tests of the ham indicated that bacteria were present. The Court observed, however, at page 59, that these tests did not show when the contamination occurred. The facts in the case were: the ham was not in a sealed container; it was purchased on June 11; it was taken to another person's home and kept in the refrigerator until approximately 6:30 a. m. on June 12; it was then cooked until about noon and taken to the plaintiffs' home where it cooled at room temperature until about 5:00 p. m.—the air temperature that day averaging 79 to 96 degrees; enough meat was then sliced from the small end of the ham to feed seven persons, none of whom became sick; the ham was then placed in the

refrigerator until the following morning—June 13; at noon that day the ham and other foods were eaten, and shortly thereafter, the persons who ate the ham became ill; the following day—June 14—samples of the ham were taken, and they were mailed, unrefrigerated, to Springfield where the tests were taken on June 17. The trial court had refused to admit the report of the test in evidence because of the remoteness of the examination. This ruling was not appealed.

However, judgment was entered against the defendant, from which it appealed, claiming that the trial court should have granted its motions for a directed verdict. The Appellate and Supreme Courts referred to the results of the test as though they had been admitted in evidence. Both reviewing Courts held that the trial court erred in denying the motions for a directed verdict. The Courts observed that on June 12, seven persons ate the ham without any ill effect—a strong indication that it was not then contaminated. They also observed, among other things, that the ham had been unrefrigerated at least two days prior to the test, and there was a particularly strong suggestion, under all of the facts, that the ham may have become contaminated after it was cooked and while it was cooling.

In Bowman v. Woodway Stores, 345 Ill 110, 177 NE 727 (1931), also cited by the defendant, the court again had before it only the question of whether a verdict should have been directed for the defendant where "Pet" milk was alleged to have been the cause of the illness and death. The evaporated milk had been mixed with water from a cistern; the unused portion of the milk was destroyed; the milk had no peculiar taste or odor; and the can had no unusual appearance. The can, together with other cans, was examined three months later by an analytical expert who found no ptomaine, and was of the opinion that had there been any bacteria or poison in the

can on the day in question, the spoiled condition would have manifested itself by a bulging of the can and by taste and odor.

Neither of the above cases established that the tests conducted by the witness were not relevant. They indicated that a verdict should be directed for the defendant: (1) absent competent evidence that the product in question was contaminated; or, (2) where there was evidence of contamination, then absent further competent evidence that the product was in such condition when it left the defendant's control.

In the case before us, the plaintiff testified that the physical appearance of the contents of the bottle was the same at the time of the trial as it was on the day she drank from it. She, and others, testified relative to the sediment and particles in the Coke, and to the slime on the inside of the bottle.

█ In view of all of the evidence, we believe the trial court was correct in permitting the testimony of the biochemist to stand. The evidence was relevant with respect to whether the plaintiff was injured by reason of a foreign substance in the Coke at the time she drank it. There was sufficient additional evidence to render his testimony both relevant and admissible: it was for the jury to determine its probative value.

█ █ The defendant contends that comments by the court and misconduct of the plaintiff's counsel deprived it of a fair trial. The defendant's counsel asked the court to admonish the plaintiff to answer the questions without volunteering information. The court did not so admonish her, but rather, on one occasion remarked that "her answers are not so different from most witnesses and most human beings," and at another time stated that he thought she had answered the question. An examination of the plaintiff's testimony convinces us that the court was correct, and also, that the comments of the court did not deprive the defendant of a fair trial.

■ The same can be said of counsel's claimed misconduct. In questioning the plaintiff's husband, counsel asked him if he had missed work as a result of the incident. The defendant objected and the plaintiff's counsel then agreed that any such loss of work was not a part of the case; and the jury was instructed to disregard the question and answer. We do not believe this conduct on the part of the plaintiff's counsel indicated a purpose to prejudice the jury, nor that it had such effect. Ziegler v. Smith, 86 Ill App2d 215, 222, 229 NE2d 340 (1967).

■ ■ As to the other evidentiary errors claimed: The testimony pertaining to her fall at the hospital and resulting injury was some evidence of her claim of dizziness at the time, and was properly admitted. The court properly excluded the cross-examination of the men who helped the plaintiff move, with reference to the condition of her health when they left the premises, as beyond the scope of the direct examination. Other testimony clearly indicated that the plaintiff did not begin to feel ill until that evening—after these men had gone.

The limiting of the cross-examination of these men might have been unduly restrictive, and the testimony of the plaintiff's husband improper, but we cannot concur that these errors were prejudicial to the defendant's rights. Ziegler v. Smith, supra, 224. Accordingly, the judgment of the trial court is affirmed.

Judgment affirmed.

ABRAHAMSON, P. J. and MORAN, J., concur.

### SUPPLEMENTAL OPINION ON DENIAL OF PETITION FOR REHEARING.

Upon petition for rehearing, the defendant urges, among other things, that we failed to comment on his point that certain testimony of the biochemist should

have been stricken because it was highly prejudicial and speculative. The biochemist testified on direct examination that there is a wide variety of rhizopus mold, some of which can be eaten without any harm and others which can be extremely dangerous.

The thrust of the contention is aimed at the words "extremely dangerous." However, on cross-examination, the biochemist stated:

> "The molds about which I was speaking were not viable when I was examining them. They were not living. They were dead molds when I examined them.
>
> "Q. Can you tell us, sir, with any degree of medical or—strike the word medical—biochemical certainty when the mold had died? A. No. I cannot.
>
> "I made my examination between the 20th and 30th of April. I continued to watch it grow each day. I did not cause the mold to grow. I examined what was already there, which was dead.
>
> "Q. Then can you tell me with a reasonable degree of medical certainty when before the date of your examination the mold was alive? A. No, I cannot.
>
> "I cannot answer yes or no that molds change over the course of time.
>
> "Some rhizopus are dangerous and some are not.
>
> "Q. Now you never stated in your direct examination whether or not the molds that you were speaking about were of one class or another in terms of—I guess we'll have to use the word 'danger.' Do you know the answer to that question? A. This is quite impossible without extensive medical tests. I cannot specifically state that this particular mold, which I examined, will produce untoward effects."

32

The defendant urges that this testimony was prejudicial and speculative in that the chemist could never say with any degree of biochemical certainty whether or not the dangerous type of rhizopus mold was involved in this case; and that his motion for a mistrial should have been granted because of the failure of the biochemist to connect the extremely dangerous type of rhizopus mold with this case.

In our opinion we noted that the "trial court refused to strike the testimony of this witness, and stated that the defendant's objections were to the weight to be accorded the testimony rather than to its admissibility"; that the "court expressed doubt as to whether the testimony helped the plaintiff's case"; that the plaintiff and others "testified that the physical appearance of the contents of the bottle was the same at the time of the trial as it was on the day she drank from it"; and that she and others "testified relative to the sediment and particles in the Coke, and to the slime on the inside of the bottle." In view of all of the evidence, we sustained the trial court in permitting this testimony to stand.

When we consider this testimony in its totality, we find nothing prejudicial in it. We believe it to be relevant and question whether it could be classed as speculative. We distinguish this case from Marut v. Costello, 53 Ill App2d 340, 362, 202 NE2d 853 (1964), and other cases cited by the defendant. However, even if we assume for the purpose of argument in this case that the evidence was improperly admitted, we find the error to be harmless in that no prejudice was caused thereby. The object of the review of judgments of trial courts is not to determine whether the record is free from error but to ascertain whether a just conclusion had been reached, founded upon competent and sufficient evidence, in a trial in which no error has occurred which might be prejudicial to a litigant's rights. People

■■■■■■■■■■

v. Storer, 329 Ill 536, 542, 161 NE 76 (1928); Ziegler v. Smith, 86 Ill App2d 215, 224, 229 NE2d 340 (1967); Reske v. Klein, 33 Ill App2d 302, 312, 313, 179 NE2d 415 (1962); Johnson v. Chicago & N. W. Ry. Co., 9 Ill App2d 340, 357, 358, 132 NE2d 678 (1956).

Consequently, we adhere to the affirmation of the judgment herein and deny the petition for rehearing.

Judgment affirmed and petition for rehearing denied.