No. 81-440

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

MICHAEL R. JACQUES,

Plaintiff, Respondent and
Cross-Appellant,

vs.

THE MONTANA NATIONAL GUARD, DEPARTMENT
OF MILITARY AFFAIRS OF THE STATE OF
MONTANA, and THE STATE OF MONTANA,

Defendants, Appellants and
Cross-Respondents.

Appeal from:   District Court of the Third Judicial District,
               In and for the County of Deer Lodge
               Honorable Robert Boyd, Judge presiding.

Counsel of Record:

    For Appellants:

        Garlington, Lohn and Robinson, Missoula, Montana
        Gary L. Graham argued and Gary B. Chumbrau argued,
          Missoula, Montana

    For Respondent:

        Johnson, Skakles and Kebe, Anaconda, Montana
        Greg J. Skakles argued, Anaconda, Montana

                          Submitted: May 21, 1982

                          Decided: August 23, 1982

Filed: AUG 23 1982

Thomas J. Kearney Clerk

Mr. Justice Frank B. Morrison, Jr., delivered the Opinion of the Court.

This is an appeal by defendant from judgment entered May 15, 1981, by the Third Judicial District Court following a jury verdict in favor of plaintiff for $1,390,000.00 and from the order entered thereafter on post-trial motions. Plaintiff cross-appeals.

Plaintiff's legs were traumatically amputated by an explosion on February 6, 1977. Plaintiff, employed at the Anaconda Smelter in Anaconda, Montana, had been engaged in a conversation with a co-employee, Larry Raver. During the conversation, Raver picked up a "projectile" or large shell from his nearby truck and was holding it in his hands. Raver explained to the plaintiff that the shell was a dud but that it was designed to "go off" in a certain manner. When Raver was concluding this statement, the plaintiff, concerned of the danger, began running for safety. The shell exploded. Raver was killed and plaintiff's injuries ensued.

Plaintiff filed suit against the Montana National Guard and the State of Montana alleging that the decedent Raver obtained the shell from the National Guard firing range in the Deer Lodge-Mt. Powell area. Plaintiff's proof established that the National Guard held exercises in this area and that large ammunition was left after the exercises. Plaintiff alleged negligence in failure to clean up the area and in leaving live ammunition where the public had access to it. Substantial credibile evidence established a case of negligence and defendants do not appeal that determination. Defendants contend that plaintiff totally failed to prove that Raver obtained the shell in question from the firing range near Deer Lodge.

-2-

Two other issues are presented for review. Defendants contend that the present limitation on state liability for damages should apply or, in the alternative, that any recovery should be limited to applicable insurance limits. In a cross-appeal plaintiff challenges the constitutionality of section 2-9-317, MCA, which exempts the State from paying interest on judgments for a two year period. The sufficiency of evidence question must be decided first.

SUFFICIENCY OF EVIDENCE

Plaintiff's case for proximate cause was supported by the following:

(1) Plaintiff's testimony that the shell which caused his injuries was approximately eighteen inches long and about three inches in diameter;

(2) Evidence from the National Guard that exercises near Deer Lodge had included the firing of a projectile about eighteen inches long with a three-four inch diameter;

(3) Testimony from several witnesses that large live rounds had been found in the area of Mt. Powell;

(4) Deposition testimony from Larry Raver's widow establishing that Raver had traveled by motorcycle in the Mt. Powell area and during his motorcycle travels had collected what might be termed "junk items";

(5) Larry Raver, while demonstrating a large shell to a co-employee prior to this accident, stated that he had found the shell;

(6) Other sources of the shell in question were few, if any.

Defendant countered with expert testimony tending to prove that the round which exploded and injured the plaintiff was a 2.75 inch rocket round with a mark-176 fuse. Defendants'

-3-

evidence further sought to prove that such a rocket round had never been fired by the Montana National Guard at the Deer Lodge firing range.

The issue is whether plaintiff's circumstantial evidence was sufficient to create a jury issue on proximate cause. It is incumbent upon the plaintiff to present evidence from which a jury might reasonably infer that Larry Raver obtained the shell in question from the National Guard firing range near Deer Lodge. Circumstantial evidence sufficient to prove proximate cause in a civil cause need not exclude every reasonable conclusion other than the conclusion sought to be established. Lenherr v. NRM Corp. (D.Kan. 1980), 504 F.Supp. 165. Plaintiff's evidence is sufficient if it affords a basis for a reasonable inference by the trier of fact although there are other reasonable inferences which might be drawn by that trier of fact. Arterburn v. St. Joseph Hospital and Rehabilitation Center (1976), 220 Kan. 57, 61, 551 P.2d 886, 891.

With these rules in mind, we will now review that evidence offered by plaintiff to prove the proximate cause thesis. Upon this evidence, the plaintiff's contention for a submissible jury issue must rise or fall.

The following testimony was given by Gerald Effing, retired National Guard Colonel:

> "Q. Did you know anything about the firing area down in Deer Lodge?
>
> "A. Yes, I did.
>
> "Q. Could you tell us what you knew about that area?
>
> "A. Well, we started firing there in 1956 and fired there in '56 and '57 and then we went down to Townsend in 1958 or about 1961 and then went back to Deer Lodge for '62 through '66.
>
> ". . .
>
> "Q. What type of guns or what did you fire there?

-4-

"A. Well, the artillery, we had 105 millimeter howitzers and we had 155 millimeter howitzers.

"Q. And the ammunition which the artillery fired, was that all live ammunition?

"A. Yes, it was.

". . .

"Q. First, could you state what the general size of a 105 projectile is?

"A. As far as length?

"Q. Just generally.

"A. It would probably be 18 inches long.

"Q. Okay.

"A. About three or four inches in diameter."

The following testimony of the plaintiff was offered to show the similarity of the shell which injured the plaintiff. Mickey Jacques testified:

"Q. Did you have a chance to look at the shell he was holding?

"A. Yes.

"Q. And could you describe it for us?

"A. Yes. It was a foot -- approximately a foot and a half long and about three inches in diameter."

Plaintiff sought through several witnesses to establish the existence of similar rounds following National Guard exercises. The following testimony is illustrative. Charles Fudge, Forester, U.S. Forest Service, testified:

"Q. Prior to this first time you came in contact in June of 1969 with the National Guard people, had you ever been on the Montana State Prison property or forest service property in the vicinity where this fire occurred?

"A. Yes.

"Q. Had you ever observed any rounds or projectiles out there?

"A. Yes. To the best of my recollection, it would have been in the fall. It would have been in the fall of 1968.

"Q. Do you recall where you were when you observed these projectiles?

"A. They were on the face of a grassland area leading up towards Deer Lodge Mountain and Mount Powell ridge, both on Montana State Prison land and at the top of the edge of a grass opening where timber began. I observed one or more projectiles on National Forest lands."

Defense cross-examination of Charles Fudge revealed the following:

"Q. Have any other incidents come to your attention where high explosive projectiles have been found in the area?

"A. Yes.

"Q. When was that?

"A. I believe that was in 1972.

"Q. Would you relate what your recollection of those events were?

"A. Yes. Rob Malinsky, who was an assistant of mine at Deer Lodge, came to me one day and indicated that he had a report from a Deer Lodge resident, as I recall, who had found some projectiles along the shore or just within Powell Lake."

Laurence Lambert, Montana State Prison employee, testified:

"Q. What area did you see those shells in? Is there a creek or something?

"A. It's on the ridge between Tin Cup Creek and Robinson Creek. There's a horse trail that goes to the lake and it's right where the horse trail breaks at the top of the ridge.

"Q. How long ago did you see these shells?

"A. I would say it was '77 or '78.

"Q. Has there been more than one shell you've observed out there?

"A. Yes.

"Q. How many would you say?

"A. Oh, about 30."

Other corroborative evidence was received but the testimony quoted above represents the type of proof offered by the plaintiff to establish the existence of large shells in the area of the Deer Lodge firing range.

Plaintiff produced through deposition testimony of Larry Raver's widow, evidence that Raver traveled in the area where similar rounds were known to have existed. In pertinent part, she testified as follows:

"Q. Would he ride his bike twelve months out of the year?

"A. Yes.

"Q. Do you have any idea where he rode, Delores?

"A. Well, I know for a fact that he rode on the mountains up above our house. He rode quite a bit around Helena, he rode alot over towards Wisdom and German Gulch. He just crisscrossed everywhere on that bike.

". . .

"Q. Did Larry ever bring anything back with him, Delores, when he was on these rides?

"A. He would bring back little things that he found of interest. He might spend an afternoon going through an old rambled-down shack and anything that he thought was adventurous, he would bring it home.

"Q. How would he carry these things?

"A. I had bought him a set of saddlebags for the bike and they got torn, so he put a rack on the back of the bike and he had a box fixed to it that he could put his things in.

"Q. Where did Larry used to fish, Delores?

"A. Mainly in rivers and streams, but all over the State -- or this part of the State.

"Q. Do you know whether he ever camped or fished in any of the mountain lakes up in the Racetrack or Mount Powell area?

"A. Yes, he went up there frequently."

Plaintiff offered the testimony of co-employees, that Raver had displayed a large projectile to them at a time prior to this accident, and had told them where he had found it. Defendants objected on the basis of hearsay and the objection was sustained. However, the following testimony was introduced through James Ficklin, a co-employee, and

was received without objection:

> "Q. Did you ever see a shell in Larry Raver's possession up on the hill?
>
> "A. . . . I'm not sure of the exact date. It seems to me it was a couple weeks prior to when Mick was injured and Larry was killed. . . I was late for work that day and Larry followed me into the lot. . .he did specify that he had something that he wanted to show me that he found.
>
> "Q. When he pulled up behind you and stopped you, did he get out of the car?
>
> "A. I pulled in and parked my vehicle and when I got out, Larry was outside of his truck but he had his door open. What he was doing was security. When I turned, I walked up and approached the vehicle and when I turned around, I could see some sort of projectile."

Testimony that Raver found a shell, which may have been the one responsible for plaintiff's injuries, provides evidence from which the jury could rule out several alternative sources, i.e., that Raver brought the shell home from Vietnam or that he purchased it from anyone.

Plaintiff offered other testimony tending to prove that the plaintiff had not traveled widely outside of Montana, had not brought the shell back from Vietnam, and generally proved the lack of other sources for a projectile similar to the one which injured the plaintiff.

Defendant produced expert testimony, which, if believed, established that the round which injured the plaintiff had not been fired at the Deer Lodge firing range. It is unnecessary to detail this testimony. Plaintiff was able to impeach the credibility of defense experts to some extent, but the expert testimony remained sufficiently strong to support a defense verdict had one been rendered.

In Thompkins v. Northwestern Union Trust Co. of Helena, Montana (1982), ____ Mont. ____, 645 P.2d 402, 408, 39 St.Rep. 845, 853, we stated that: "The jury can choose to adopt the testimony offered by one side to the exclusion of the other.

The jury is free to disregard all of the expert testimony." In most cases, expert testimony does not mandate a result because, by its very nature, expert testimony deals with opinion evidence. Irrefutable facts need not be established, and most likely would not be established, through offering expert opinion. Nevertheless, we have sought guidance from other jurisdictions. The cases which bear most directly upon the issue to be here resolved are cases dealing with product identification. In those cases the plaintiff was injured by a defective product and the defendant contended plaintiff had failed to prove that defendant was related to the product in question.

In Smith v. J. C. Penney Company, Inc. (1974), 269 Or. 643, 525 P.2d 1299, plaintiff was badly burned when a gasoline fire ignited her coat. Suit was instituted against the retailer, J. C. Penney Company, and against Bunker-Ramo, alleged by plaintiff to have supplied the fabric used by the manufacturer. A verdict was returned against Bunker-Ramo who then appealed. Plaintiff sought to prove that a Borg trade name on the fabric identified defendant Bunker-Ramo as the supplier. At trial, Rothman, an employee of the manufacturer Roseta, explained that the identification linking Bunker-Ramo to the fabric was meaningless; that from June 2, 1970, forward, Roseta obtained fabric from both Mauldin Mills and Bunker-Ramo but that all fabrics, including those obtained from Mauldin Mills, bore the Bunker-Ramo label. Therefore, it was concluded that it would be impossible to tell whether the fabric in question came from Bunker-Ramo or from Mauldin Mills. Bunker-Ramo further offered expert testimony from an employee who testified that an analysis of plaintiff's coat showed that the fabric in plaintiff's coat definitely was

supplied by Mauldin Mills and not Bunker-Ramo. This evidence

was not contradicted by other expert testimony. On appeal

the question was whether there was sufficient evidence

linking the coat to defendant, Bunker-Ramo. In sustaining

the jury verdict, the Supreme Court of Oregon said:

> "Or the jury could find that even if it were
> manufactured subsequent to June 2, 1970, the
> notations on the cutting order and the tags
> proved Roseta used Borg fabrics. They could
> disbelieve Rothman's explanation that such
> notations did not prove Borg fabrics were
> used." 525 P.2d at 1302.

In commenting on defendant's expert testimony, the

Oregon court said:

> "The jury did not have to accept the testi-
> mony of Mr. Swihart although his testimony
> was not directly contradicted." 525 P.2d at
> 1303.

The Oregon court held that the witness was sufficiently

impeached for credibility to be a jury issue.

In Neubauer v. Coca Cola Bottling Company of Chicago (1968),

96 Ill.App.2d 18, 238 N.E.2d 437, plaintiff was injured by

the putrid contents of a Coca Cola. Plaintiff offered proof

that the Coca Cola bottle was a ten-ounce bottle purchased

from "Tony's Liquor Store." The owner of Tony's Liquor

Store testified that defendant had never supplied him ten-

ounce Coke bottles. The Illinois court held that such

testimony did not foreclose a verdict for plaintiff. The

court said:

> "The defendant relies, primarily, on the fact
> that the Coke in question was in a ten-ounce
> bottle; that the store owner and the defen-
> dant's employees testified that ten-ounce
> bottles of Coke were not sold to the store;
> that the defendant's witnesses stated that
> ten-ounce bottles are sold to business enti-
> ties where there is on-the-premises consump-
> tion through coin operated coolers, and to
> certain other outlets for resale in case lots
> as leader items. . .

> "We cannot say that the plaintiff's testimony,
> and the further evidence that the defendant
> was the exclusive distributor in the area, and

-10-

> that Tony's Liquor Store purchased its Coke
> from the defendant, is of insufficient pro-
> bative value to show that the Coke in question
> was bottled by the defendant.  The direct,
> positive evidence relative to the ten-ounce
> bottle was conflicting.  From this evidence
> the jury might well have determined that a
> ten-ounce bottle was mistakenly delivered
> to Tony's Liquor Store by the defendant.
> Whatever else it may have determined on
> the basis of these facts, there was adequate
> evidence for a jury to decide that the Coke
> in question was bottled and sold by the de-
> fendant."  238 N.E.2d at 439-440.

We think expert testimony offered by defendant, though unrefuted except for impeachment, does not compel or mandate a result for defendant.  The jury should be free to weigh that testimony and should be able to accept or reject it.

We must here decide whether, viewing the evidence in a light most favorable to plaintiff, a jury issue was created. Plaintiff offered no direct evidence to prove that decedent Larry Raver obtained the projectile which injured the plaintiff, from the firing range near Deer Lodge.  Whether plaintiff has succeeded in creating a submissible fact question on proximate cause presents a close question to this Court. The resolution of this question necessarily involves evaluating the role of a trial judge or appellate court in removing cases from jury consideration.

The following language from Karczewski v. Ford Motor Company (N.D. Ind. 1974), 382 F.Supp. 1346, aff'd 515 F.2d 511 (7th Cir. 1975), is instructive:

> "Motions for directed verdict or for judgment
> N.O.V. are proper only when there is a complete
> absence of any evidence to warrant submission
> to a jury.  Cities Service Oil Co. v. Laurey,
> 403 F.2d 537 (5th Cir. 1968).  In this regard
> evidence and all inferences must be considered
> in the light most favorable to the party oppos-
> ing directed verdict.  Continental Air Lines
> v. Wagner Morehouse, 401 F.2d 23 (7th Cir.
> 1968).  Some courts suggest that only evidence
> supporting the theories of the party opposing
> directed verdict may be considered.  Dun &
> Bradstreet v. Miller, 398 F.2d 218 (5th Cir.
> 1968).  Others suggest that directed verdict
> is proper only where there is a complete ab-
> sence of the probative facts to support the

jury verdict. Boeing Co. v. Shipman, 411
F.2d 365 (5th Cir. 1969). The fundamental
idea in all this compels a Federal district
trial court to exercise the greatest self-
restraint in interfering with the constitu-
tionally mandated processes of jury decision.
The message is to do so only in the clearest
of cases. This is manifestly not one of
them." 382 F.Supp. at 1348.

We agree with the legal philosophy articulated by Judge

Allen Sharp in the Karczewski case. Recently this Court

reversed a new trial granted to plaintiff, thereby reinstating

a jury verdict in favor of defendant. In disapproving the

trial judge's preemptive order we said:

"To honor this action would create a bench
supremacy and sap the vitality of jury ver-
dicts." Nelson v. Hartman, Cause No. 81-467
(decided August 5, 1982), ____ Mont. ____,
____ P.2d ____, ____ St.Rep. ____.

We agree with the sentiment expressed by Justice Black

in a dissenting opinion filed in Galloway v. United States

(1943), 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458, (Black,

J., dissenting). Mr. Justice Black, in warning of possible

constitutional infringements inherent in the directed verdict

or nonsuit, said:

"As for myself, I believe that a verdict
should be directed, if at all, only when,
without weighing the credibility of the
witnesses, there is in the evidence no
room whatever for honest difference of
opinion over the factual issue in contro-
versy. I shall continue to believe that
in all other cases a judge should, in
obedience to the command of the Seventh
Amendment, not interfere with the jury's
function. Since this is a matter of high
constitutional importance, appellate courts
should be alert to insure the preservation
of this constitutional right even though
each case necessarily turns on its peculiar
circumstances." 319 U.S. at 407, 63 S.Ct.
at 1096, 87 L.Ed. at 1480.

Applying the above articulated principle to the facts

here, we cannot say that there is a complete absence of

proof on proximate cause which would prevent plaintiff from

having a jury resolution of his case. From the facts which

we have detailed in this opinion, we hold that a jury of twelve reasonable people, could infer without resort to speculation, that the projectile which injured plaintiff came from the firing range near Deer Lodge. The jury was not compelled to accept the testimony of defendants' expert witnesses. Rather, that testimony could properly be weighed against plaintiff's circumstantial proof leaving the trier of fact free to make the factual determination. The jury has spoken, and regardless of how this Court would have decided the fact issues, we must affirm a verdict which we have found to be supported by substantial credible evidence.

IS PLAINTIFF'S RECOVERY LIMITED?

Appellants contend that exposure in this case is limited to applicable insurance limits by section 40-4402, R.C.M. 1947. The statute, adopted in 1963, provides as follows:

> "Immunity defense prohibited when liability insured-reduction of award to policy limits. Whenever an insurer accepts any premium, money, or other consideration from a political subdivision of the state, municipality, or any public body, corporation, commission, board, agency, organization, or other public entity for casualty or liability insurance, neither such insured nor insurer shall raise the defense of immunity from suit in any damage action brought against such insured or insurer, and any agreement in the insurance contract permitting the defense of immunity is hereby declared void. . . If the court determines that the defendant could have successfully raised the defense of immunity, and if the verdict exceeds the limits of the applicable insurance, the court shall reduce the amount of such judgment or award to a sum equal to the applicable limit stated in the policy."

The 1972 Montana Constitution, Article II, Section 18, provides:

> "The state. . .shall have no immunity from suit for injury to a person or property, except as may be specifically provided by law by a 2/3 vote of each house of the legislature."

The intent of section 40-4402 was to provide for waiver of sovereign immunity where insurance was carried but to limit such waiver to the limits of the liability policy. The statute itself contemplated the existence of governmental immunity which was abolished by the new constitution. The purpose of the statute is made clear by the title which provided:

> "An act prohibiting the defense of sovereign immunity where public bodies are insured;. . . and providing for the reduction of awards to policy limits where sovereign immunity defense could have been successfully raised;. . ." Ch. 240, Laws of Mont. (1963).

Sovereign immunity could not be raised as a defense in this case. The statute has no application.

Section 2-9-104, MCA, limiting state liability, became law after this accident but was in effect at time of trial. Appellants contend section 2-9-104, MCA, is procedural and limits plaintiff's recovery because it existed when judgment was rendered. This question was disposed of in Dvorak v. Huntley Project Irrigation District (1981), ____ Mont. ____, 639 P.2d 62, 38 St.Rep. 2176. Damages are substantive and the measure of damage is governed by law in effect on the date of injury. The District Court order denying any limitation on plaintiff's recovery is affirmed.

IS THE STATE EXEMPT FROM PAYING INTEREST FOR TWO YEARS?

Section 2-9-317, MCA, provides:

> "No interest if judgment paid within two years. If a governmental entity pays a judgment within 2 years after the day on which the judgment is entered, no penalty or interest may be assessed against the governmental entity."

Plaintiff contends that this statute violates Article II, Section 18, of the 1972 Montana Constitution, which we have previously set forth, in that it has the effect of limiting the plaintiff's recovery.

-14-

In Leaseamerica v. State (1981), ____ Mont. ____, 625 P.2d 68, 38 St.Rep. 398, we held that the constitutional provision abolishing governmental immunity did not render invalid the statute exempting the State from paying interest upon a judgment.  However, we based that decision upon the fact that the constitutional provision was intended to apply only to torts and that since the subject matter of Leaseamerica v. State was a contract, the constitutional provision had no application.  We did not decide whether the State could be freed from paying interest on a tort judgment.

In the past this Court has treated interest as something apart from the cause of action.  In Stanford v. Coram (1903), 28 Mont. 288, 72 P. 655, the Court said:

> ". . . The judgment is itself a creation of law.  It bears no interest unless granted by legislative enactment. . . A party is not entitled to interest merely because he has a judgment, but solely because the legislature, in its discretion, has said he may charge interest."  28 Mont. at 292, 72 P. at 655.

This Court has also stated that interest is a damage for delay in payment of the principle obligation.  See State Highway Commission v. Marsh (1978), 175 Mont. 460, 575 P.2d 38.

We hold that interest on a judgment is not an integral part of the cause of action itself.  We find that section 2-9-317, MCA, does not offend Article II, Section 18, of the Montana Constitution.  We do not here decide whether the State can be treated differently from other tort-feasors concerning the subject of damages which are part of the cause of action itself.  We rather hold that interest, not being a detriment arising from the wrongful act, can be suspended by statute as was done here.

The judgment of the District Court is affirmed in its entirety.

Justice

-15-

We Concur:

_Frank I. Haswell_
Chief Justice

_Gene B. Daly_

_____

_John C. Sheehy_

_____

Justices

Mr. Justice John Conway Harrison dissenting.

Having carefully examined this record, I find that the most that can be said for the proof offered by the plaintiff is as follows:

1. Large ammunition was fired by the National Guard on the National Guard firing range near Deer Lodge, Montana.

2. Raver had large ammunition in his possession, which exploded and seriously injured the plaintiff.

The question before this Court was whether or not this proof made a jury issue; whether the shell could not have come from some other place?

In my opinion, the defendant's witnesses established that the projectile that injured the plaintiff, could not have come from the Deer Lodge area because such a projectile had never been fired in that area. However, the jury could disbelieve this testimony and therefore we had to consider whether or not the plaintiff, by any manner, proved his case.

In my opinion, there was no testimony in the record linking the exploding projectile to ammunition used by the National Guard at its firing range near Deer Lodge. There is no proximate cause evidence in the record to support the verdict in favor of the plaintiff. Therefore, while it can be argued that the shell could not likely have come from any other place; if the plaintiff has a case, it is on the basis that it came from some other place and is connected somehow to the defendant.

The following testimony of James Ficklin offered by respondent falls short of proving that the projectile came from the Deer Lodge area:

> "Q. How did you know him? A. I worked approximately a year as a security guard during the time I was laid off in the pipe shop and I met Larry prior to that time because my father was head of security and I met Larry through stopping in his office.
>
> "Q. At the time this accident occurred, what department were you employed at. A. I was a pipe fitter.
>
> "Q. So you would have known Larry Raver before that time; is that correct? A. Yes.

"Q. Did you ever see a shell in Larry Raver's possession up on the hill? A. I was working maintenance. I'm not sure of the exact date. It seems to me it was a couple weeks prior to when Mick was injured and Larry was killed. I parked at that time -- I parked in a lot in front on the coal pulverizer which is adjacent to the converter building. I was late for work that day and Larry followed me into the lot and at that time -- the conversation is fairly sketchy but he did specify that he had something that he wanted to show me that he found.

"MR. CHUMRAU: I object, Your Honor, on the basis of hearsay. THE COURT: Overruled.

"Q. (By Mr. Skakles) You recall this was approximately two weeks before the accident? A. It seems to me it was just prior to the accident.

"Q. Where were you when you talked to him at that time? A. Well, there was an empty lot outside the converter building, outside the maintenance office, and that's where the buildng was that was referred to as the coal pulverizer and this was across the road from that area.

"Q. When he pulled up behind you and stopped you, did her get out of the car? A. I pulled in and parked my vehicle and when I got out, Larry was outside of his truck but he had his door open. What he was doing was security. When I turned, I walked up and approached the vehicle and when I turned around, I could see some sort of projectile.

"Q. Did he say anything when you turned around?

"MR. CHUMRAU: I object, Your Honor, on the basis of hearsay. THE COURT: You may testify as to whether or not you had a conversation but not as to anything that was said.

"A. Could you clarify that?

"THE COURT: Did you have a conversation?

"A. Yes, we did.

"THE COURT: You may not testify as to anything that was said because that would be hearsay.

"Q. (By Mr. Skakles) How long did this epi-sode take? A. Relatively short, a few seconds. I was late for work and once I saw what he had, I got a good enough glimpse that I knew it was a projectile and I don't like things like that. I took off for work.

"Q. You entered into a casual conversation; is that correct? A. Not really.

"Q. Do you know why he pulled up behind you? A. I got the impression he wanted to show me

that object because I do remember him stating --

"MR. CHUMRAU: I object, Your Honor, on the basis of hearsay. THE COURT: You may not testify as to anything said to you, Mr. Ficklin, but only as to the facts that took place and what was done but not what was said.

"Q. (By Mr. Skakles) It was a shell? A. Of some sort, yes.

"MR. SKAKLES: I have no further questions. THE COURT: You may cross-examine, Mr. Chumrau.

## CROSS-EXAMAMINATION

BY MR. CHUMRAU:

"Q. Mr. Ficklin, we had a deposition with you earlier, didn't we, in January of this year? A. Yes, we did.

"Q. And you were a pretty good friend of Larry Raver's and Micky Jacques; is that correct? A. Yes.

"Q. You came from Washington to testify at this trial? A. Yes, I did.

"Q. Now, do you also remember that this object, this projectile, was kind of tarnished brown in color and anywhere from 8 to 12 inches -- A. In my deposition, I believe I stated as close as I could tell it was 8 or 9 inches long. As for color, it had a brownish-greenish cast to it.

"Q. Brownish-greenish cast? A. That kind of rough cast to it. I believe at the time I said it looked like tarnish or -- that metal or brass picks up.

"Q. Mr. Ficklin, as we said, we took your deposition at the end of January and at that time I asked you certain questions and you gave certain answers; is that true? A. Yes.

"Q. On that day in January, which was January 30th, 1981, was this questions asked of you and this answer given by you? THE COURT: Show it to him first, counsel. A. Yes, I believe I did say that.

"Q. The question was: 'You didn't see any green color?' and the answer was, 'Not that I recall.' Isn't it also true that the shell was basically a consistent color and there was no dramatic change in color? I stated it was primarily one color. It was somewhat mottled from what I could see but it was fairly one consistency.

"Q. Now, Mr. Ficklin, isn't it also true that you haven't heard a specific description of the shell that actually exploded on February 6th; isn't that true? A. No, I haven't.

- 19 -

"Q. And you were not on duty that day? A. No, I was off on another shift.

"Q. So isn't it true that you have no way of knowing the shell that exploded on that day was the same shell you saw in his truck before work that day? A. No, I don't.

"Q. In other words, it could have been a completely different shell; isn't that true? A. I suppose it could have been.

"Q. Isn't it also true that you think he got the shell out of the cab that you saw? A. From as near as I could tell, it was somewhere in the cab of the vehicle.

"MR. CHUMRAU: I have no futher questions. THE COURT: Any redirect?

"MR. SKAKLES: I have no questions. THE COURT: You may step down, Mr. Ficklin.

"MR. SKAKLES: I call Harry Casey."

However, there was excluded testimony which may have made a jury issue for the plaintiff. Here, the plaintiff sought to establish through the testimony of James Ficklin, a co-worker, and Harry Casey, another co-employee, that the decedent, Raver, told each of the two witnesses that he obtained the shells from an area near Deer Lodge. The shells discussed in those conversations were large projectiles in the decedent's possession weeks or months before the accident. The plaintiff's proposed testimony, sought to be introduced through Ficklin and Casey, would not have established beyond doubt that the projectile that exploded came from the Deer Lodge area. However, since the shells, which he stated came from the firing range at Deer Lodge, are similar to the one which was exploded, it is my opinion that a jury issue on whether the exploding projectile came from the Deer Lodge area would be made on behalf of the plaintiff and, therefore, the crucial issue would become whether to admit the hearsay which was excluded by Judge Boyd.

The testimony that was excluded as hearsay was sustained without any reasons given. We do not know from the record whether the trial court considered certain exceptions to the hearsay rule. Had the trial court given its reasons for excluding said testimony, this court could have reviewed the

correctness of the trial court's rulings without deferring to the trial court's discretion.

Here the plaintiff claims that statements of Raver made to both Casey and Ficklin are admissible as declarations against interest. This brings us to interpretation of our Rule 804 of the Montana Rules of Evidence. The applicable portion of the rule reads as follows:

> "(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> ". . .
>
> "(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, or to make him an object of hatred, ridicule, or disgrace, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
>
> ". . .
>
> "(5) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having comparable circumstancial guarantees of trustworthiness." Rule 804(b)(3)(5) Mont.R.Evid.

It is my opinion that it is stretching the rule to say that the proposed testimony constitutes a "statement against interest" as contemplated by the rule. It is my view of the law that we need not make that determination since I believe that these statements of the decedent should be admitted under subsection (5) other exceptions as set forth above. In attempting to determine the intent of subsection (5), it is necessary to go back to the commission comments. We should note that the Federal Rule 804(b)(5) governs other exceptions of the hearsay rule. The federal rule states:

> "A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness. If the court determines that (A)

> the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by the admission of the statement into evidence. . ." Rule 804(b)(5), Fed.R.Evid.

Here the offered testimony qualifies under the guidelines enunciated specifically by the federal rule. That is to say, the offered testimony is "(1) material, and (2) more probative on the point than any other evidence which the plaintiff could offer, and (3) the ends of justice would be served." The plaintiff has no other evidence to take this case to the jury. It certainly would frustrate the cause of justice to deny the admission of those statements.

Montana does not have a specific guideline setting forth the federal rule; our drafters of the Rules of Evidence for Montana wished to have the broader rule which would allow the admission of hearsay and which would not fall within the federal guidelines. See comments in "Montana Lawyers Rule Book," at page 118.

It is obvious in reading the comments of the drafters of our rules of evidence that they wished to have a more liberal hearsay rule which would allow for the admission of evidence not contemplated as admissible under the federal rule. Since the testimony sought to be submitted by the plaintiff here would qualify under the federal guidelines it most certainly should be admitted under a more liberal Montana rule. I believe the following factors militate strongly in favor of the admission of testimony: (1) The declarant is deceased and therefore unavailable at trial; (2) there is nothing inherent in the circumstances of the statement which would indicate there was a motive on the part of the declarant to lie about the facts sought to be admitted; (3) the plaintiff cannot establish the fact in any other way; (4) the justice would be frustrated by the exclusion of such essential testimony.

For the above reason, I would reverse and remand the case for retrial on the basis that there was insufficient evidence to support a verdict, but, with the admission of the excluded testimony, a jury issue might have been made.

In summation, I feel while there is not evidence in the record linking the exploding projectile to the National Guard firing range near Deer Lodge, with the admission of the testimony of Casey and Ficklin, a case might be made. Feeling that it was error to exclude this testimony, I would remand for retrial.

_____
Justice

Mr. Justice Daniel J. Shea dissenting:

I do not believe that the evidence was sufficient to permit a jury to find that the offending projectile was found on the National Guard firing range or near the firing range near Deer Lodge. On the other hand, had the trial court admitted the testimony of James Ficklin and Harry Casey that the decedent told them he had found the shell near Deer Lodge, a jury issue was made. Justice Harrison correctly concludes that the evidence should have been admitted. Accordingly, I join Justice Harrison in his dissent that the judgment should be vacated and a new trial ordered -- with the direction that the excluded testimony of Ficklin and Casey should be admitted.

_____
Justice