JUSTICE WARNER
dissents.
¶83 I dissent from the Court’s Opinion and its remand of this action to the District Court. A correct interpretation of the law requires the decision of the District Court to dismiss this suit be affirmed.
¶84 Virtually all of the Miners’ claims arose before the adoption of the 1972 Montana Constitution which became effective July 1, 1973. Absent the Court’s innovative re-definition of the doctrine of sovereign *419 immunity, this suit could not be maintained. Thus, I discuss this pivotal issue first, not last.
Sovereign Immunity
¶85 The Court concludes at ¶ 80 the doctrine of sovereign immunity does not bar Appellants’ claims where the alleged breach of duty occurred prior to July 1, 1973. To reach this conclusion, the Court narrowly focuses on the words “suit for injury” contained in Article II, Section 18 of the 1972 Montana Constitution, and then equates this language to the “accrual” of an action. The result is that, because the Miners’ claims for relief did not accrue until after the 1972 Constitution ended governmental immunity from suit, the doctrine of sovereign immunity does not apply.
¶86 The Court erroneously considers sovereign immunity as a simple bar to suits against the government. Thus, reasons the Court, a lawsuit that may “accrue” after the purported bar is lifted, is allowed. Focusing on the damages element of tort, the Court does not even attempt to address the issue of duty, or lack thereof, in a sovereign immunity context. The Court ignores that, because of the nature of sovereign immunity, the State had no duty whatsoever to the plaintiffs and thus a tort by the State cannot be established no matter the date of the injury.
¶87 As opposed to being merely a bar to suit, sovereign immunity is a legal doctrine to the effect that actions or omissions of the government do not constitute a breach of duty owed to its citizens. Sovereign immunity arose out of necessity to ensure the political and economic stability of the government by insulating the public treasury from suits for monetary damages. It made no difference whether such suits were in equity, in contract or in tort. It was deemed better that the public coffers, and thus the stability of the government, not be compromised by having to pay for something that might be done by the government to a private citizen.
[S]hould any prince have so much weakness and ill nature ... the inconveniency of some particular mischiefs ... are well recompensed by the peace of the public, and security of the government ... it being safer for the body, that some few private men should be sometimes in danger to suffer, than that the head of the republic should be easily, and upon slight occasions, exposed.
John Locke, Two Treatises of Government, Ch.18, (4th ed. 1764).
¶88 In feudal England the theory initially was that the king, being subject to no higher tribunal, and in that sense the ultimate maker of *420 law, was considered incapable of wrong. As the medieval period progressed, this theory evolved and the doctrine transformed into one holding that the king, that is, the government could do wrong, but this wrong was not recognized by the law.[5] In Blackstone’s terms, the doctrine of sovereign immunity was phrased:
The supposition of law therefore is, that neither the king nor either house of parliament (collectively taken) is capable of doing any wrong; since in such cases the law feels itself incapable of furnishing any adequate remedy. For which reason all oppressions, which may happen to spring from any branch of the sovereign power, must necessarily be out of the reach of any stated rule, or express legal provision ....
Blackstone, Commentaries on the Laws of England, vol.1, ch.7, 237-38 (1765).
¶89 In other words, even though the government might act unfairly, breach a contract or be negligent, in the eyes of our common law jurisprudence such was not a wrong that the law recognized. This is much different, and much more, than a bar to a particular lawsuit. The act or omission of the government simply was not wrong.
¶90 In the late-eighteenth century, the American colonists revolted and began the formation of their own government, without a monarch, and with a constitution. Thus, in the United States there was no “sovereign” per se to whom immunity could attach. While this may have been an opportune time to discard the doctrine, it remained firmly entrenched in the new nation[6].
¶91 Like most states, from its territorial days Montana did not allow itself to be subject to liability for breach of a contract or for any tort.
We hold, therefore, that unless permitted by some law of this Territory, or of the general government, no citizen of this Territory can sue it. There is no law of this Territory or act of Congress permitting it. There is, then, no legal power to enforce *421 territorial contracts. In other words, there is no obligation to territorial contracts. They rest simply on the good faith of the Territory.
Langford v. King (1868), 1 Mont. 33, 38.
¶92 In Montana, the State had no obligation, that is, duty to its citizens. “Duty” and “right” are correlative terms; “where there is no duty there can be no right.” John Chipman Gray, The Nature and Sources of the Law, 8 (2d ed., MacMillan Co. 1921). Thus, before the 1972 Constitution was adopted, a citizen had no right to seek damages against the State and the State had no correlative duty to its citizens. See generally, Murphy v. State (1991), 248 Mont. 82, 809 P.2d 16.
¶93 In step with the rise of the insurance age, the courts and legislatures of many states began to weaken sovereign immunity.[7] In Montana, a citizen’s right to sue the State was enacted as Article II, Section 18, of the 1972 Montana Constitution. This provision became effective on July 1, 1973.
¶94 With the adoption of our new constitution, Montana citizens acquired a right to sue the State where none had existed before. This new right created the correlative duty which had not existed previously, and imposed for the first time on the Montana State Treasury an obligation to pay damages for a breach of a contract or for tortious conduct.
¶95 Now, this Court holds for the first time[8] that if one of the elements of a tort occurs subsequent to the abrogation of sovereign immunity, this sequence of events somehow transmogrifies an act or omission that was not wrong into a breach of a duty that did not exist. By focusing on when the damage occurred, the Court forgets that at the time of the alleged breach of duty by the State, it owed no duty at all to the Miners. Sovereign immunity is not a bar to an action, it is a legal doctrine to the effect that the government had no duty to respond in damages to its citizens for its acts or omissions. When sovereign immunity was abolished, this changed, but by no stretch of logic or law can it be said that an act or omission done while the doctrine was in effect retroactively creates such a duty. I agree with Federal District *422 Court Judge Molloy who, when faced with this same question, determined that “[mjeasuring the accrual of sovereign immunity based on the discovery of damage is not a principled basis for determining the scope of sovereign immunity.” Dickerman v. W.R. Grace, CV-00-130-M-DWM, 4 (D. Mont. 2000).
¶96 Without any support from the Constitutional Convention transcripts, the Court incorrectly concludes at ¶ 70 the delegates to the 1972 Constitutional Convention actually intended the State would not be immune from any claim for relief that matured, that is, accrued after July 1, 1973. However, the 1972 Constitutional Convention Bill Of Rights Committee made it clear that, while the doctrine of sovereign immunity was outdated and unfair, there was no intention to subject the State to claims that pre-dated the new Article II, Section 18.
The committee is well-aware that implementation of this provision could cause some difficulties if done uithout [sic, without] permitting affected agencies to upgrade their currently inadequate coverage. Accordingly, it is recommended that this provision not be retrospective in its application; that, in order to permit agencies time to obtain adequate insurance coverage as provided by legislative appropriation, it shall not be effective until June 1, 1553 [sic, 1973]; and that it shall be effective only as to causes of action arising after that date. The committee commends this provision to the convention with the belief that its adoption will insure that redress for wrongs will be administered on behalf of and against all parties, governmental as well as private.
Montana Constitutional Convention, Bill Of Rights Committee Proposal, Comments, February 23,1972, Volume II, p. 638.
¶97 Sovereign immunity was abrogated only because insurance was available. This Court cannot be, and is not, concerned with the question of whether the potential loss is insured. However, the discussion of insurance is highly relevant to determining the intent of the delegates concerning retroactive application of Article II, Section 18. It is crystal clear it was the intention of the drafters of the 1972 Constitution that anything which had previously occurred could not give rise to lawsuits. Montana was starting with a clean slate.
¶98 The Court also ignores the plain words of the Transition Schedule, § 3, of the 1972 Constitution which states:
Section 3. Prospective operation of declaration of rights.
Any rights, procedural or substantive, created for the first time by Article II shall be prospective and not retroactive.
*423 ¶99 There is no question the right of a citizen to sue the State of Montana was created by Article II, Section 18, of the 1972 Constitution. There also is no question this new right was prospective only.
¶100 Further, the Court ignores the Convention Note to Transition Schedule § 3, which was drafted by a committee of the delegates and presented to the populace to educate the voters as to what each section of the new constitution was intended to accomplish. Such note states the intention of the delegates:
Convention Notes:
Any new rights created in Article II take effect only after July 1, 1973. It does not create any right for past events.
¶101 This is an additional acknowledgment from the delegates themselves that a new right was created with the adoption of the new constitution. It was not intended that past events would give rise to subsequent obligations by the government.
¶102 Indeed, this Court has previously recognized the prospective application of “new rights” under Article II of the 1972 Montana Constitution in another context. In connection with the right to be free from sex discrimination, another new right which was created by Article II of the 1972 Constitution, this Court held in a domestic relations case:
Appellant cannot rely on rights arising under Article II, Section 4,1972 Montana Constitution, for under the Transition Schedule Section 3 any “rights, procedural or substantive, created for the first time * * * shall be prospective and not retroactive.”
Rogers v. Rogers (1976), 169 Mont. 403, 406, 548 P.2d 141, 143.
¶103 Both the right to be free from sex discrimination in Rogers, and the right to sue the State at issue in this case, were newly created rights in Article II. The result must be the same in this case as in Rogers. New rights, created for the first time by the 1972 Montana Constitution, are to be enforced prospectively only.
¶ 104 In my view, these expressions of the intentions of the delegates cannot be avoided by the Court’s reference at ¶ 71 to an 1879 statute concerning periods of limitation. Nor can such intention be avoided by referring to the dissimilar law of other states or the Federal Tort Claims Act.
¶105 It cannot be doubted that abolishing sovereign immunity is the preferred approach in these modern times. However, that is not the question before us in this case. Sovereign immunity was the law in Montana from this Court’s 1868 decision in Langford, until July 1, *424 1973, at which time it was abolished with regard to future acts. I suspect millions of people in this country know about the tragic injuries to the Miners by now. I share the sympathy which necessarily must flow to them. But it is simply incorrect as a matter of law for this Court to redefine the doctrine of sovereign immunity, change it, or find a new way around it in an effort to provide a remedy. Since territorial days the people, the legislature,, both of the constitutional conventions and this Court have consistently relied on sovereign immunity. Nothing that occurred, or failed to occur, prior to sovereign immunity’s abolition on July 1,1973, can properly subject the State to liability for money damages in tort.
Legal Duty
¶106 Notwithstanding the Court’s erroneous conclusion that sovereign immunity does not defeat these Miners’ claims against the State, the Court still needed to find a legal duty on the State’s part in order to reach its desired conclusion that this suit is viable. It finds such duty by incomplete references and misleading quotations from statutes of yesteryear. By innovative surgery, the Court grafts together a variety of statutory duties and foists them upon the State. However, a careful consideration of these statutes reveals that the “duties”imposed by the Court did not exist at the time the statutes were enacted, but are created only by the Court’s judicial alchemy.
¶107 The Court concludes that a duty to the Miners is established because the statutes it cites created a duty running from the State to the workers. First, the Court concludes at ¶ 22 that the various statutes applied to the vermiculite mining industry. This is correct. The statutes applied to all industries and the District Court did not rule otherwise. But translating the performance of a discretionary function and the dissemination of any results, as required by statute, into a statutory duty to warn is something else entirely. The Court specifically explains in ¶ 23 this duty exists because:
[T]he duty to gather information related to the effects upon workers or the public of conditions of employment “for diffusion among and use by the people” was never displaced or eliminated from the law. The State had the mandatory obligation from 1907 through 1999 to gather public health-related information and provide it to the people. Section 2448, RCM (1921); § 69-105, RCM (1947); renumbered in 1969 to § 69-4110(3), RCM (1947); renumbered in 1978 to § 50-1-202, MCA.
¶108 However, an accurate analysis of the entirety of these cited statutory provisions reveals a far different story about this so-called *425 “mandatory obligation.” Section 2, Ch. 110, L. 1907, consisted of a long list of powers granted to the State Board of Health which were characterized by that statute as “general supervision” and “general oversight.” The particular phrase emphasized by the Court-“for diffusion among the people’-actually states, in its entirety:
[T]hey [the State Board of Health] shall gather such information in respect to all these matters as they may deem proper for diffusion among the people .... [Emphasis added.]
¶109 Ripping the phrase “for diffusion among the people” from the statute mid-phrase, the Court removes it from its context and from its meaning, magically turning it into a “mandatory obligation” which the Court insists existed from 1907 through 1999. To the contrary, an accurate reading of the statute demonstrates that the power of the Board to gather what information it, in its discretion, deemed proper and to diffuse such information “among the people” was completely discretionary with the Board-to be exercised “in respect to all matters as they deem proper.” No mandatory obligation was created, because the exercise of this power was completely discretionary.
¶110 This discretionary language stayed in the statute, see § 69-105, RCM (1947), until the entire section was repealed in 1967 by Section 223, Chapter 197, Laws of Montana 1967. At the same time, the language upon which the Court heavily relies, “for diffusion among the people,” was repealed, and did not exist in the law after 1967, although similar language was thereafter adopted, as discussed below. Thus, it is clear that these provisions, when studied in toto, merely bestowed discretionary options on the state agency, and mandated nothing.
¶111 In 1967, an entirely new statutory scheme was enacted, with language regarding the functions of the newly distinguished Board of Health and Department of Health. From these provisions, the Court cites and relies upon § 69-4110(3), RCM (1967), to support its conclusion that the State had a continuing duty to the workers. That statute provided:
69-4110. Functions, powers and duties of department. With policy guidance of the state board, the department shall:
(3) make investigations, disseminate information, and make recommendations for control of diseases and improvement of public health to persons, groups or the public .... [Emphasis added.]
¶112 Although this provision generally authorized the Department to make investigations and disseminate information to “persons, *426 groups or the public,” this power was to be exercised pursuant to the “policy guidance of the state board.” Clearly, exercise of the power remained a discretionary function under this enactment, and a “mandatory obligation” giving rise to a legal duty was not created thereby. If the statute did not require the agency to exercise a power or to undertake a function, but rather delineated options to be exercised as the Board from time to time saw fit, such a provision cannot be construed as creating any mandatory duty whatsoever, much less a specific duty owed to the particular Miners here.
¶113 As a part of the 1967 changes to the law in question, the Legislature enacted Chapter 197, Laws of Montana 1967, Sections 19-23. These sections were codified as the new Title 69, Chapter 42, RCM, Industrial Hygiene. Taking a part of the new industrial hygiene statutes out of context, and omitting a part of the specific statute, the Court boldly states at ¶ 38 the State of Montana, by virtue of § 69-4202, RCM (1967), took upon itself a duty to correct or prevent conditions which were hazardous to health at any place of employment, and thus the State had a duty to the Miners to prevent their injuries. The clear and sweeping effect of this conclusion is that, at least during this period of time, the State undertook a legal obligation-a statutory duty in tort according to the Court-to correct all conditions which were hazardous to health, in every single place of work in Montana. Also, according to the Court, the State had a duty to prevent any recurrence of an unhealthful condition upon pain of being liable in tort to any injured worker. A large undertaking! Indeed, one I conclude borders on the absurd.
¶114 Title 69, Chapter 42, RCM (1967), does address occupational diseases and corresponding duties. The Court, at ¶ 38, again does not reveal the entire statute. Section 69-4202, RCM (1967), stated “the state board of health shall adopt rules and make orders to correct or prevent conditions which are hazardous to health at any place of employment.” Then, the next section, § 69-4203(3), RCM, requires the department of health to investigate the conditions of any place of employment at any time. Section 69-4203(4), RCM, merely requires the department to “report the findings of investigations to the industry concerned and co-operate with the industry in preventing or correcting conditions which are hazardous to health.” (Emphasis added.) Section 69-4204(1), RCM, goes on to require the reporting of occupational diseases by health care providers and state employees within 11 days of discovery. Of importance, reports made “are neither public records nor open to public inspection.” Section 69-4204(2), RCM. Clearly, these *427 specific statutes regarding occupational diseases require the reports generated by the investigation are to be given to the “industry concerned” and “are neither public records nor open to public inspection.” These specific statutes control as against the general statutes regarding the duties of the board. See § 1-2-102, MCA.
¶ 115 In reality, Title 69, Chapter 42, RCM, Industrial Hygiene, was in no way intended to, and did not, create a duty on the part of the State to correct or prevent all hazardous workplace conditions on pain of making the State hable for any damages if such were not completely eliminated never to recur.
¶116 In 1971, the Legislature enacted Chapter 316, Laws of Montana 1971, which changed the law again and created the Occupational Health Act of Montana. This Act, in addition to the provisions cited by the Court, continued to provide that information collected by the Department concerning pollutants or operations are only for the confidential use of the Department and that only the owner or operator of an inspected premises can obtain a copy of the report on request. See §§ 50-70-109(1), 115(3), MCA. Importantly, the Occupational Health Act expressly provides that it does not:
[A]bridge, limit, impair, create, enlarge, or otherwise affect substantively or procedurally the right of a person to damage or other relief, or otherwise affect substantively or procedurally the right of a person to damage or other relief on account of injury to persons or property and to maintain an action or other appropriate proceeding.
Section 50-70-118(3), MCA. Thus, the expressed intention of the Legislature was not only that inspection reports were not to be disseminated, it was that the Act would not “create” or “enlarge” any procedural or substantive right to seek damages. In determining the Act creates a special duty which exposes the State to liability, the Court abrogates this provision.
¶117 In addressing the duty issue, the District Court carefully analyzed the statutes at issue here and concluded, in part, as follows:
Plaintiffs have pointed to a number of other statutes that have existed over the years that they feel impose a statutory duty enforceable by these Plaintiffs. However, the statutes do not specifically impose a duty on the State to protect employees from exposure from asbestos or to warn employees of the dangers of such exposure. These statutes are very general and apply to “various industries” all over the state and do not deal with any specific hazard to be detected and prevented by the State.
*428 ... it is critical to note that none of these statutes are specific as to the danger or the industry being addressed. They all are very general.
It appears that these statutes, if they impose any duty at all, impose a directive to the Department of Health and its employees as to what their general duties are. There is nothing in any of these statutes that evidences a specific legislative concern with a particular industry or a particular type of worker. Thus, in short, the Court finds no statutory duty exists on which Plaintiffs may base their case.
¶118 The District Court’s analysis is correct. These statutes do not even mention, let alone create, a duty owed by the State Department of Health to the workers of a particular industry. At best, these provisions constitute general directives to the agency itself, by which the agency is empowered to address public health problems with the industry involved. Unfortunate as it may have been, the State’s actions of yesteryear were for the purpose of “working with the industry,” and not directed to, or communicated with, the workers. Therefore, these efforts did not create a duty imposed on the State of Montana to warn the Miners that their health was in danger because of the defalcations of their employer.
¶119 The Court acknowledges that the State agencies in question placed great weight on Attorney General Bonner’s 1942 opinion in not disseminating information to the Miners. It then concludes that they were wrong in doing so. The Court’s analysis concerning this Opinion and its use is also flawed. The various health agencies were justified in their reliance on it.
¶120 The Attorney General, as acknowledged by the Court at ¶ 27, concluded that the Board of Health’s reports were confidential. Although not binding on this Court, an Attorney General’s (“AG’s”) Opinion in which the Legislature has acquiesced is persuasive and will be upheld unless palpably erroneous. See, e.g., Stewart v. Region II Child & Fam. Servs. (1990), 242 Mont. 88, 97, 788 P.2d 913, 919; State ex rel. Ebel v. Schye (1956), 130 Mont. 537, 541, 305 P.2d 350, 353; State ex rel. Barr v. District Court (1939), 108 Mont. 433, 436, 91 P.2d 399, 400. The Court is incorrect in its view that the AG’s Opinion at issue in this case is palpably erroneous.
¶121 The issue before us, however, is not the correctness of the Opinion. The issue is the effect of that Opinion-acquiesced in by the Legislature-on those to whom it was directed at the time and for *429 decades thereafter. It is one thing to conclude an AG’s Opinion is erroneous. It is quite another to determine 62 years later that an Opinion was not binding at the time it was issued and, therefore, the persons who relied on it were wrong in doing so. While we have not directly addressed the issue, we indicated in O’Shaughnessy v. Wolfe (1984), 212 Mont. 12, 16, 685 P.2d 361, 363, that AG Opinions are binding on those requesting them or to whom they apply, absent a contrary ruling from this Court. How can we now “unbind” those clearly bound by a 1942 AG’s Opinion by our contrary opinion on the law? What, then, is the purpose of our 80-year-old statute requiring the Montana Attorney General to provide legal opinions in writing, without fee, to those entitled by law to request them? See, e.g., § 199(6), RCM (1921); § 82-401(6), RCM (1947); § 2-15-501, MCA.
¶122 In its rush to do the right thing by the Miners in this case, the Court makes AG’s Opinions not only useless, but dangerous. What busy Attorney General in his or her right mind would continue to issue such opinions once this Court has held the persons to whom they are directed rely on them at their peril? Having obtained an AG Opinion, should those who sought it then seek competing legal opinions, or should they merely ignore it because it may be wrong and relying on it may decades later be the basis of liability?
¶123 An examination of the AG’s Opinion leads to the conclusion that it was not incorrect and most assuredly was not “palpably erroneous.” In 1939, the Legislature created the Industrial Hygiene Division of the Board of Health (IHD) and required it, among other things, to study and investigate industrial hygiene and occupation disease and “report to the industries concerned the findings of such investigations....” Sections 1,2(1), (3), (5), Ch. 127, L. 1939, re-codified as §§ 69-201 through 208, RCM (1947) (emphasis added). Section 5 of Chapter 127 required at least annual statistical summaries of all reported occupational diseases, together with dissemination of instruction and information believed appropriate to prevent the occurrence or recurrence of occupational diseases “to all employers of this State.” (Emphasis added). Section 7 required health care providers and certain mine inspectors, upon request of the secretary of the IHD, to report knowledge of any occupational disease and file a report regarding that knowledge. Section 7 stated without equivocation that “such reports and all records and data of the [IHD]... pertaining to such diseases are hereby declared not to be public records or open to public inspection ....” Section 7, Ch. 127, L. 1939 (emphasis added).
¶124 It is clear that nothing in Chapter 127 required or even *430 suggested public dissemination of investigations and studies by the IHD. Those matters were to be reported to the involved industries. Moreover, as noted above, the language of Section 7 clearly prohibited making the reports from health care providers and “all records and data of the division” public or open to public inspection. Attorney General Bonner’s Opinion in 1942 responded to a query about whether reports of workplace investigations should be furnished to anyone requesting them by relying on the clear language of Section 7. He concluded the reports were not public records or open to public inspection. I would conclude the Opinion was 1) not palpably erroneous, and 2) even if incorrect, binding from its issuance until today. For these reasons, I disagree with the Court’s analysis of the AG’s 1942 Opinion.
¶125 Nor do I agree with the Court that the re-codification and renumbering of Section 7 of Chapter 127 as § 69-207, RCM (1947), changed anything at all about the law. The language of § 69-207, RCM (1947), was identical in all respects to the former Section 7. It continued to require physicians, other health care providers and mine inspectors “having knowledge of a case of occupational disease” to report such cases “upon request” of the secretary of the IHD. More importantly, those reports “and all records and data of the division of industrial hygiene of the state of Montana pertaining to such diseases are hereby declared not to be public records or open to public inspection.” The Court fails to read the statute in its entirety and according to its plain language.
¶126 Moreover, the Court is simply wrong in its unsupported statement that the presumption accorded the title of an act as expressing the Legislature’s intent “applies equally to titles of sections within an act.” To the contrary, it is well established in Montana that “the text of [a] statute takes precedence over the title in matters of statutory interpretation.” See, e.g., Orozco v. Day (1997), 281 Mont. 341, 348, 934 P.2d 1009, 1012; ISC Distributors, Inc. v. Trevor (1996), 273 Mont. 185, 196, 903 P.2d 170, 177; Manufacturing Acceptance Corp v. Krsul (1968), 151 Mont. 28, 35, 438 P.2d 667, 671. Consequently, the so-called “title” of § 69-207, RCM (1947)-added by the Code Commissioner, and which speaks of a “duty of physicians and others to report cases”-cannot, and does not, impact the language contained within the statute. As discussed above, in 1947, § 69-207, RCM, retained the clear “not public records” language previously contained in Section 7 of Chapter 127.
¶127 Additionally, with regard to the 1942 AG Opinion, the Court *431 states at ¶ 30:
[T]he language of the original § 7 interpreted by Attorney General Bonner was significantly revised by the legislature in 1967. The result of the legislative revision was to clarify § 7 in a manner that continued to prohibit health care workers from disclosing private medical records but that rendered Attorney General Bonner’s Opinion moot.
¶128 As stated above, in 1967, the Legislature generally revised the laws relating to the Board of Health, amending and repealing many statutes. See Ch. 197, L. 1967. In doing so, the Legislature created a number of statutes under the heading “State Board of Health,” which created the board and set forth its general duties, one of which was to “make investigations, disseminate information, and make recommendations for control of diseases and improvement of public health to persons, groups, or the public.” See Sec. 10(3), Ch. 197, L. 1967. Nothing in those statutes requires particular investigations, much less requires that results of each and every investigation be disseminated to the public.
¶129 Totally overlooked by the Court in the context of the 1942 Attorney General’s Opinion is Title 69, Chapter 42, Industrial Hygiene. This chapter expressly addresses occupational diseases and corresponding duties. As previously explained, these specific statutes regarding occupational diseases require only that the reports generated by the investigation are to be given to the “industry concerned” and “are neither public records nor open to public inspection.”
¶130 Thus, while I agree with the Court that the 1967 amendments retained the prohibition against disclosure of reports of occupational diseases, neither logic nor law allows me to join the Court’s next giant step. That is, I cannot agree with the Court’s implicit conclusion that, because the earlier language about “division data” was deleted, thereby “mooting” that portion of the AG Opinion, there somehow sprang into being an express requirement that other occupational disease reports suddenly were required to be disseminated to the public. Nothing in the statutes at any point in their history requires it and, indeed, such an interpretation is belied by the express provision in the 1967 legislation that the findings of investigations into occupational diseases were to be reported “to the industry concerned
¶131 Finally, with regard to the AG’s Opinion, I feel compelled to express my disappointment with the Court’s language at ¶ 28 when it *432 speaks of reliance on the AG Opinion “to justify the concealment of the results of workplace inspections” and the statement at ¶ 30 about “the State’s decision to withhold from the workers at the Libby Mine investigation reports.” These statements clearly imply that public employees-“the State”- engaged in some sort of conspiracy to harm the Libby Miners. I am sad the Court would see fit to suggest that employees in the executive branch of government would conduct themselves in such a fashion. I disagree.
Public Duty Doctrine
¶132 Having invented a statutory duty, never enacted or intended by the Legislature, the Court next goes on to determine the Public Duty Doctrine does not defeat the Miners’ claims because the “special relationship” exception to the doctrine applies. The Court’s description of the Public Duty Doctrine, and the special relationship exception is correct. In my view, however, the Court errs in concluding the special relationship exception applies in the present case.
¶133 First, and in a circular fashion, the Court states the special relationship exception applies because the statutes in question here were intended to “protect workers from occupational diseases.” Although the Court correctly reasons “the lack of specificity in these statutes does not render them meaningless,” a protective intent or meaning does not necessarily create a special relationship. Assuming, arguendo, these statutes created a duty to the Miners, even the Court does not posit these statutes applied solely to them. Thus, they cannot be said to apply to the “specific class of persons” of which the plaintiffs are members, that is, workers at the Libby mines. The statutes covered all Montana workers who were employed, in every occupation, and in every place in the State. The Public Duty Doctrine provides that if a statute creates a duty to everyone, it does not create a duty to a specific class of persons. The Court acknowledges this in ¶ 41. Yet, the Court’s conclusion is that when a statute creates a duty to everyone it raises the exception to the Public Duty Doctrine because it creates a duty to a specific class of persons. Considering the very definition of the Public Duty Doctrine, I find this singularly confusing. I must disagree with the Court in this regard.
¶134 The statutes in question do not even mention, let alone create a special relationship with, the workers of a particular industry. At best, these provisions constitute general directives to the agency itself, by which the agency is empowered to address public health problems. As such, they create no “special duty that is more particular than the duty owed to the public at large.” Nelson, ¶ 22. Nonetheless, the Court *433 reads a special duty into these provisions, an analysis which taken to its logical conclusion would create a special relationship between the State and every single Montana citizen in every place of work. Indeed, the Court determines this “special duty’ exists because these statutes “were designed to protect men and women working in the various industries in Montana from occupational disease.” See ¶ 44. Such an argument could be made about virtually any directive in the Montana Code Annotated.
¶135 Next, the Court says that a special relationship was created with the Miners because they repeatedly saw State employees making inspections and this “qualifies as a ‘specific action to protect a person’ and creates a special relationship between the State and the Miners.” ¶ 45. The actions taken were discretionary inspections. The Miners’ complaint is the State did not take any affirmative action to warn them after these inspections. Unfortunate as it may have been, the State’s actions in past decades were for the purpose of “working with the industry,” and not directed to, or communicated with, the workers. Therefore, these efforts cannot be considered a “specific action to protect a person.”
¶136 Neither can the State’s inspections be considered actions which reasonably induced detrimental reliance which would create a special relationship under the Public Duty Doctrine. See Nelson, ¶ 22. What the Court in essence concludes at ¶ 46 is that even though the Miners knew there was a danger, the lack of information from the State equates to the State telling them there was no danger. This erroneous conclusion is reached because the Court fixates on the inspections themselves as the “act” upon which the Miners may rely, and not on the salient point that there was no representation at all to the Miners upon which they could reasonably rely. It is every bit as logical to reason the lack of information equates to the State telling the Miners there was a danger. However, the point is this: The State took no action upon which the Miners could reasonably rely which would create a special relationship between it and the Miners, and the Court’s contrary conclusion appears to be a stretch for a desired result.
¶137 The workers were not told of any dangers because the law at that time prohibited such disclosure, and thus the State’s discretionary decision to make inspections at Libby could not create rebanee that gives rise to the necessary special relationship.
¶138 In the end, I conclude that the Court changes centuries of law on sovereign immunity, creates a mandatory statutory duty out of discretionary code provisions, and misconstrues the special *434 relationship exception to the Public Duty Doctrine. I too wish the proper defendant was not, in all probability, judgment proof. I cannot join what is, in my view, the creation, by judicial fiat, of a remedy where the State is now substituted for a bankrupt employer.
¶139 I dissent.
CHIEF JUSTICE GRAY and JUSTICE RICE join in the foregoing dissent.

 David E. Engdahl, Immunity and Accountability For Positive Governmental Wrongs, 44 U. Colo. L. Rev. 1, 3 (1972). The Magna Carta concept of government subject to law was born, and the phrase “the king can do no wrong” in actuality meant that the king certainly could do wrong, but would not be permitted to by the law.

 “It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. This is the general sense, and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union.” Alexander Hamilton, Federalist No. 81 (1788).

 Engdahl, at 59.

 Jacques v. Montana Nat’l Guard (1987), 199 Mont. 493, 506-07, 649 P.2d 1319, 1326, does not stand for the proposition that an event that happened while sovereign immunity was in effect could 40 years later give rise to an action against the State. In Jacques the plaintiff was injured and the damages were sustained after the legislature abrogated the doctrine.